PRESSURE VESSELS OF PUERTO RICO, INC. ET AL., demandantes y recurrentes, *v.* EMPIRE GAS DE PUERTO RICO, PROGASCO INC., TROPIGAS DE PUERTO RICO, INC. y LIQUILUX GAS CORPORATION ET AL., demandandos y recurridos.

*Número:* RE-90-78 *Resuelto:* 23 de noviembre de 1994

498

*Agustín F. Fortuño* y *Rafael Morán Loubriel,* abogados de los recurrentes; *Ivonne Palerm,* de *Brown, Newsom & Córdova,* abogada de los recurridos Progasco, Inc. y Patrick J. Holland; *Manuel Fernández Mejías* y *Fernando Pérez Colón,* abogados de la recurrida Empire Gas de Puerto Rico y Ramón González Cordero; *Susana Cortina de Cárdenas,*

de *Lasa, Escalera & Reichard*, abogada de la recurrida Tropigas de Puerto Rico, Inc.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Nos corresponde examinar si una moción para desestimar una demanda por el fundamento de que lo alegado no justifica la concesión de un remedio, debe ser analizada de manera diferente cuando se alegan violaciones a las leyes antimonopolísticas. Concluimos en la negativa. Ante dicha moción, se aplican los mismos criterios generales que se usarían con cualquier otra causa de acción. En este caso en particular, resolvemos que erró el tribunal de instancia al desestimar la demanda instada por los recurrentes.

I

Los hechos del presente caso, *según surgen de las alegaciones de los demandantes*, son los siguientes.[1] Pressure Vessels of Puerto Rico Inc. (en adelante PV) —una corporación que se dedicaba a la manufactura y reparación de cilindros para envasar gas propano— y algunos de sus accionistas, directores y oficiales, instaron una demanda contra ciertas corporaciones dedicadas a la importación y venta de cilindros para gas propano, así como a la venta de gas propano, amparados en el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, y en la Ley Núm. 77 de 25 de junio de 1964 (10 L.P.R.A. sec. 257 y ss.).[2]

Específicamente, fueron demandadas cuatro (4) corporaciones que se han dedicado a la venta y distribución de gas propano —desde el 1985 hasta el presente— así como a

---

[1] Como más adelante se señala, a los fines de disponer de una moción de desestimación como la instada en el presente caso, estamos obligados a considerar como ciertas todas las alegaciones de la demanda.

[2] Pressure Vessels of Puerto Rico Inc. (en adelante PV) pretendió comenzar este negocio en 1985. También demandaron Rafael J. Reboredo Pérez, Laureano Carus Abarca y Nilsa González de Carus, quienes eran accionistas, oficiales, directores de dicha corporación e invirtieron dinero, tiempo y esfuerzo en la gestión de negocios de PV.

la importación, transportación, uso y venta de cilindros para gas propano: Empire Gas de Puerto Rico (Empire Gas), Tropigas de Puerto Rico, Inc. (Tropigas), Progasco Inc. (Progasco) y Liquilux Gas Corporation (Liquilux). También fueron demandados Ramón González, William Rosado, J.P. Holland, Farid Chehab y Antonio R. Hernández, quienes son directores, oficiales, síndicos y administradores de dichas corporaciones.

Según se alega en la demanda, el 3 de diciembre de 1982 Empire Gas suscribió un contrato con Puerto Rico Fuels, división de Martin Gas Sales Inc. (Martin Gas),(³) por el cual Empire Gas se comprometió a comprarle todo el gas que necesitara a Puerto Rico Fuels. A cambio, Puerto Rico Fuels se comprometió a no venderle gas licuado (*liquified pretroleum gas* o L.P.G.) a ninguna otra entidad en Puerto Rico, a menos que tuviera el consentimiento previo de Ramón González, dueño y presidente de Empire Gas. Puerto Rico Fuels también se obligó a pagarle al señor González una regalía de centavo y medio (1.5¢) por cada galón de gas que le vendiese a Empire Gas o a cualquier otra compañía en Puerto Rico.(⁴) Además, Puerto Rico Fuels acordó cobrarle a Empire Gas el precio más bajo de

---

(³) Martin Gas Sales Inc. (en adelante Martin Gas) garantizó el cumplimiento del acuerdo por Puerto Rico Fuels. Dicho contrato fue firmado por Ramón González, "dueño" y presidente de Empire Gas de Puerto Rico (en adelante Empire Gas). Se acompañó copia del acuerdo como *Exhibit* I de la demanda.

(⁴) En cuanto al centavo y medio (1.5¢) de regalía, el contrato disponía, entre otras cosas, lo siguiente:

"1. Puerto Rico Fuels ... will pay Mr. Ramón González, Jr.; ... one and a half cent ... per gallon for all liquified petroleum gas (L.P.G.) terminalled or transferred by it from vessel to any location within the Commonwealth of Puerto Rico. Said payment must be liquidated and made on the first ... day of each month ....

"2. Empire Gas ... agrees to purchase its liquified petroleum gas (L.P.G.) requirement from Puerto Rico Fuels, as available, up to 100%, provided however, that Empire Gas ... will be entitled to purchase from any other source or supplier all amounts of L.P.G. not inmediately available at Puerto Rico Fuels terminal. All L.P.G. volumes above the 100% requirements of Empire Gas ... that must be moved from the terminal will not be the responsibility of Empire Gas ... nor Ramón González, Jr. and said volumes of L.P.G. will be sold jointly by Ramón González, Jr. and Puerto Rico Fuels with Ramón González, Jr. ... retaining the aforementioned royalty of $0.0150 per gallon.

entre los establecidos por otros tres (3) suplidores de gas: Gulf, Tropigas y Corco.

Más aún, mediante este acuerdo, Puerto Rico Fuels accedió a que si no fuera viable económicamente (*profitable*) cobrar ese precio, entonces, por el tiempo que no lo fuera, Empire Gas no estaría obligado a comprarle el gas a Puerto Rico Fuels y éste, a su vez, podría venderlo a cualquiera de una lista taxativa de compradores: Petrolane, Protane Gas, Liquilux e Imperial. Se aclaró expresamente en el contrato que aun bajo este supuesto, en el que Puerto Rico Fuels le vendería el gas a cualquiera de esas cuatro (4) compañías, Ramón González cobraría centavo y medio (1.5¢) por cada galón así vendido.

Las alegaciones de los demandantes también establecen que el 27 de febrero de 1986 otra de las corporaciones demandadas, Liquilux, suscribió un contrato con Puerto Rico Fuels. Mediante este contrato, se acordó que Puerto Rico Fuels no podría venderle su producto a ningún cliente en Puerto Rico que no fuera Empire Gas, Liquilux, Tropigas o Progasco. Además, Puerto Rico Fuels se comprometió frente a Liquilux a cobrarle el gas a Empire Gas y a la propia Liquilux a por lo menos dos centavos (.2¢) por galón más barato que a Tropigas y Progasco. Es decir, mediante este contrato se estableció una preferencia en precio a favor de Empire Gas y Liquilux, quienes podrían comprar el gas a Puerto Rico Fuels más barato que Progasco y Tropigas; estableciéndose, además, que Puerto Rico Fuels no podría vender su producto a nadie más en Puerto Rico.

Además, se alega en la demanda que los demandados, en la realización de sus actividades comerciales, infringían ciertas leyes y reglamentos federales y estatales, relativos al manejo de materiales peligrosos (*hazardous materials*). Los demandantes sostienen que esta conducta, por su naturaleza e ilegalidad, viola nuestras leyes antimonopolísticas, además de generar responsabilidad bajo el Art. 1802 del Código Civil, *supra*. Específicamente, se alega que los

demandados importaban de países extranjeros cilindros para gas propano que no cumplían con los requisitos legales pertinentes; que importaban de Estados Unidos cilindros que tampoco cumplían con dichos requisitos; que reparaban cilindros sin estar autorizados a ello u ordenaban la reparación de cilindros por personas no autorizadas para ello; que reparaban cilindros de modo incompatible con la reglamentación federal pertinente; que transportaban, llenaban o vendían cilindros que no cumplían con los requisitos federales pertinentes; que no solicitaban registro, permiso o licencia para operar, manufacturar, reparar, reconstruir, llenar, transportar o vender cilindros, como era y es exigido por el ordenamiento federal así como local, y, finalmente, que no sometieron sus facilidades a una inspección inicial y periódica por parte del Departamento de Transportación federal conforme lo exigía la reglamentación federal.

Los demandantes solicitan que revisemos la sentencia del tribunal de instancia que desestimó su demanda por dejar de exponer una reclamación que justificara la concesión de un remedio. Expresó dicho foro que desestimaba la demanda "porque las alegaciones no aducen hechos que justifiquen una causa de acción bajo la Ley de Monopolios ni bajo el Art. 1802 del Código Civil". Solicitud de revisión, *Exhibit* 2, pág. 23.

## II

■ Corresponde inicialmente examinar los criterios aplicables para evaluar una moción de desestimación como la de autos. La Regla 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, permite al demandado solicitar del tribunal que se desestime la demanda en su contra cuando ésta no exponga "una reclamación que justifique la concesión de un remedio". En torno a esta disposición hemos resuelto que, a los fines de disponer de una moción de desestima-

ción, estamos obligados a dar por ciertas y buenas todas las alegaciones fácticas de la demanda presentada. Para prevalecer, el promovente de la moción tiene que demostrar que, aun así, la demanda no expone una reclamación que justifique la concesión de un remedio. Esta doctrina se aplica solamente a los hechos bien alegados y expresados de manera clara y concluyente, que de su faz no den margen a dudas. *Ramos v. Orientalist Rattan Furnt., Inc.*, 130 D.P.R. 712, 728–729 esc. 11 (1992); *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991); *Romero Arroyo v. E.L.A.*, 127 D.P.R. 724 (1991); *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989); *Ramos v. Marrero*, 116 D.P.R. 357, 369 (1985); *First Fed. Savs. v. Asoc. de Condómines*, 114 D.P.R. 426, 431–432 (1983).

■ Frente a una moción para desestimarla, la demanda debe ser interpretada lo más liberalmente posible a favor de la parte demandante, y sus alegaciones se examinarán de la manera más favorable a ésta. La demanda no deberá ser desestimada a menos que se desprenda con toda certeza que el demandante no tiene derecho a remedio alguno bajo cualquier estado de hechos que puedan ser probados en apoyo de su reclamación. Nuestro deber es considerar si a la luz de la situación más favorable al demandante, y resolviendo toda duda a favor de éste, la demanda es suficiente para constituir una reclamación válida. *Unisys v. Ramallo Brothers*, supra; *Romero Arroyo v. E.L.A.*, supra; *González Camacho v. Santos Cruz*, 124 D.P.R. 396 (1989); *Granados v. Rodríguez Estrada I*, supra; *Candal v. CT Radiology Office, Inc.*, 112 D.P.R. 227, 230–231 (1982); *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305, 309–310 (1970); *Colón v. San Patricio Corporation*, 81 D.P.R. 242, 266–267 (1959).

■ Este análisis debe hacerse tomando en cuenta que en el procedimiento civil moderno se acepta que las alegaciones sólo tienen una misión: notificar a grandes rasgos cuáles son las reclamaciones y defensas de las partes. Para

precisar con exactitud cuáles son las verdaderas cuestiones en controversia y aclarar cuáles son los hechos que deberán probarse en el juicio, es imprescindible recurrir a los procedimientos para descubrir prueba. *Bco. Central Corp. v. Capitol Plaza, Inc.*, 135 D.P.R. 760 (1994); *Mercado Cintrón v. Zeta Com., Inc.*, 135 D.P.R. 737 (1994); *Sierra v. Tribunal*, 81 D.P.R. 554, 560 (1959). Como ha señalado el Tribunal Supremo federal:

> ... [T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.... Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues. (Escolios omitidos.) *Conley v. Gibson*, 355 U.S. 41, 47–48, (1957).

De igual modo, en casos en los cuales se alegan violaciones a las leyes antimonopolísticas, se ha resuelto reiteradamente que el criterio para determinar si la demanda debe desestimarse por no exponer una causa de acción que justifique la concesión de un remedio es el mismo que en todos los demás casos. Por tal razón, solamente en casos muy excepcionales procede desestimar la demanda por dicha razón. El demandado siempre tiene disponibles varias alternativas en las Reglas de Procedimiento Civil para aligerar los procedimientos, tales como la solicitud de sentencia sumaria (32 L.P.R.A. Ap. III, R. 36), conferencias con antelación a juicio (32 L.P.R.A. Ap. III, R. 37), descubrimiento de prueba (32 L.P.R.A. Ap. III, Rs. 23–34) y desestimación contra la prueba (32 L.P.R.A. Ap. III, R. 39.2(c)). *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 746 (1976); *Radovich v. Nat. Football League*, 352 U.S. 445, 449 y 453–454 (1957); *Conley v. Gibson*, supra, págs. 45–48; *U.S. v. Employing Plasterers Assn.*, 347 U.S. 186,

189 (1954); *U.S. v. Employing Lathers*, 347 U.S. 198, 199–200 (1954); *Nagler v. Admiral Corporation*, 248 F.2d 319, 322–323 y 326 (2do Cir. 1957); *Package Closure Corporation v. Sealright Co.*, 141 F.2d 972, 978–979 (2do Cir. 1944); *Quality Foods v. Latin Am. Agribusiness Devel.*, 711 F.2d 989, 995 y 998 (11mo Cir. 1983) ("the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low .... the alleged facts need not be spelled out with exactitude, nor must recovery appear imminent.").

Más aún, el Tribunal Supremo federal ha expresado, por unanimidad, en este contexto de demandas bajo las leyes antimonopolísticas federales, que:

> ... "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." And in antitrust cases, where "the proof is largely in the hands of the alleged conspirators," dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly. (Citas omitidas.) *Hospital Bldg. Co. v. Rex Hospital Trustees*, supra, pág. 746.

Concluimos, pues, que un tribunal, al evaluar una moción para desestimar una demanda —amparada en nuestra ley antimonopolística— por ésta no aducir hechos que justifiquen la concesión de un remedio, debe aplicar el mismo criterio que usaría en cualquier otro procedimiento o reclamación.

### III

Para poder determinar si se justificaba la desestimación de la demanda por no justificar la concesión de un remedio, es necesario examinar los elementos que configuran las respectivas causas de acción bajo nuestro ordenamiento antimonopolístico y bajo el Art. 1802 del Código Civil, *supra*.

 Los demandantes apoyan su reclamación en los Arts. 2, 4 y 7 de la Ley Núm. 77, *supra*, 10 L.P.R.A. secs. 258, 260 y 263. En términos generales, dichas disposiciones están relacionadas, respectivamente, a la prohibición de restricciones irrazonables a los negocios o al comercio en Puerto Rico, de prácticas monopolísticas y de ciertos tipos de prácticas indeseables de fijación de precios. Los demandantes también descansan en los Arts. 9 y 12 de la Ley Núm. 77, *supra*, 10 L.P.R.A. secs. 265 y 268, cada uno de los cuales, respectivamente, (a) responsabiliza personalmente a los funcionarios de una corporación a quienes se pueda atribuir los actos ilegales de dicha corporación, y (b) otorga una causa de acción, por el triple de los daños sufridos, a toda persona perjudicada por razón de algún acto prohibido por la Ley Núm. 77, *supra.*

Al examinar los requisitos de cada una de las causas de acción invocadas, nos remitiremos al texto de la Ley Núm. 77, *supra*, así como a los principios ilustrativos que se puedan hallar en la jurisprudencia federal interpretativa de los estatutos federales análogos, ello debido a que nunca hemos abordado este tema sistemáticamente. Al interpretar el estatuto tenemos presente que el historial legislativo de la Ley Núm. 77, *supra*, demuestra la intención de la Asamblea Legislativa de que dicho estatuto se interprete conforme a nuestra particular realidad económica y social. Como uno de los cuatro (4) objetivos fundamentales de la ley, se cita el siguiente:

> ... Proveer una base flexible para la propia ejecución de la ley, basada en una norma de razonabilidad que permita a nuestros tribunales tomar en cuenta las características propias y las necesidades de nuestra economía, así como los planes gubernamentales y la acción privada para fomentarla; es decir, queda abierta la función creadora en la aplicación de la ley, tanto en la rama ejecutiva como en la judicial en sentido favorable a nuestro desarrollo económico, aún en el caso de disposiciones con precedentes en la legislación de los Estados Unidos. Informe conjunto de las Comisiones de lo Jurídico, de Hacienda y de

Comercio e Industria de la Cámara sobre el P. de la C. 909 (18 Diario de Sesiones de la Asamblea Legislativa 1425 (1964)).

## A. *Art. 2 de Ley Núm. 77*

El Art. 2 de la Ley Núm. 77, *supra*, proviene de la Sec. 1 de la Ley Sherman, 15 U.S.C. sec. 1. Dicho artículo dispone lo siguiente:

> Todo contrato, combinación ... o conspiración para restringir irrazonablemente los negocios o el comercio en ... Puerto Rico o en cualquier sector de éste, por la presente se declaran ilegales y toda persona que haga tales contratos o se comprometa en tales combinaciones o conspiraciones incurrirá en delito menos grave. 10 L.P.R.A. sec. 258.

El propósito cardinal de este estatuto es proteger la libre competencia. El Tribunal Supremo federal lo ha expresado del modo siguiente:

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 4 (1958).

Tanto el texto de nuestro artículo como la doctrina federal coinciden en que son tres (3) los requisitos que se tienen que establecer para demostrar una infracción a esta disposición: "(1) deberá existir algún contrato, combinación o conspiración entre dos o más entidades separadas (2) el cual restringe irrazonablemente los negocios o el comercio (3) en Puerto Rico o en cualquier sector de éste". *ABA Antitrust Section, Antitrust Law Developments* Cap. I, pág. 3 (2da ed. 1984).

La doctrina federal ha reconocido que, bajo esta disposición, algunas prácticas son consideradas irrazonables per se; otras, sólo puede determinarse que son irrazonables luego de un estudio de los hechos particulares relacionados con el negocio del que se trate, el historial de la restricción y las razones para su existencia. *National Soc. of Professional Engineers v. U.S.*, 435 U.S. 679, 692, (1978); *ABA Antitrust Developments*, supra, pág. 14.

Las prácticas que son obviamente anticompetitivas por su efecto y naturaleza, se consideran irrazonables per se y no se requiere un estudio elaborado de la industria en cuestión para concluir que son ilegales. Una vez se incurre en una de esas prácticas,(5) se viola automáticamente la Sec. 1 de la Ley Sherman, *supra*, sin que haga falta un análisis del daño que dicha práctica causa ni de la excusa ofrecida para justificarla. *ABA Antitrust Developments*, supra, pág. 22; *Northern Pac. R. Co. v. United States*, supra, pág. 5; *White Motor v. United States*, 372 U.S. 253, 263 (1963); *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11mo Cir. 1991). El Tribunal Supremo federal lo ha puesto del modo siguiente:

> ... there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. *Northern Pac. R. Co. v. United States*, supra, pág. 5.

Este criterio ha sido explicado recientemente:

> The per se rule is a method of determining whether 87 1 of the Sherman Act has been violated .... Per se and rule-of-reason analysis are ... two methods of determining whether a restraint

---

(5) El Tribunal Supremo federal ha determinado que cuatro (4) tipos de conducta son irrazonables per se: (1) fijación de precios, (2) ciertos *concerted refusals to deal*, (3) división horizontal del mercado, y (4) *tying arrangements. Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F.Supp. 1186, 1190 (1988). No se alega que alguna de estas prácticas esté implicada en el presente caso.

is "unreasonable", i.e., whether its anticompetitive effects outweigh its procompetitive effects. The per se rule is a presumption of unreasonableness based on "business certainty and litigation efficiency". It represents a "longstanding judgment that the prohibited practices by their nature have 'a substantial potential for impact on competition.' " ... "Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable." (Citas y escolios omitidos.) *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341–342 (1990).

Estas expresiones fueron reiteradas en *FTC v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 430 y 432–433 (1990), citando a *National Soc. of Professional Engineers v. U.S.*, supra, y a *Northern Pac. R. Co. v. United States*, supra. Véase, también, *Business Electronics v. Sharp Electronics*, 485 U.S. 717, 723–724 (1988).

Por otro lado, los criterios para determinar si una restricción, que no es irrazonable per se, está sin embargo prohibida por el estatuto no están claramente establecidos. *ABA Antitrust Developments*, supra, pág. 15. Véanse, además: *Chicago Board of Trade v. U.S.*, 246 U.S. 231, 238 (1918); *National Soc. of Professional Engineers v. U.S.*, supra; *Continental T.V., Inc. v. GTE Sylvania Inc.*, supra. No obstante, en términos generales, está claro que deberán examinarse diversos factores para determinar el impacto de la práctica impugnada sobre la competencia. *ABA Antitrust Developments*, supra, págs. 15–16. De la magnitud y naturaleza de dicho impacto dependerá si la práctica es irrazonable o no. Se ha determinado que el impacto es irrazonable cuando "el efecto sobre la competencia en el mercado sea sustancialmente adverso". *U.S. v. Arnold*, 388 U.S. 365, 375 (1967); *ABA Antitrust Developments*, supra, págs. 17–18; *National Soc. of Professional Engineers v. U.S.*, supra, págs. 692–693. Una de las expresiones más conocidas sobre este tema se encuentra en *Chicago Board of Trade v. U.S.*, supra, pág. 238 (Juez Brandeis):

The true test of legality is whether the restraint imposed is

such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

## B. *Art. 4 de la Ley Núm. 77*

█ El artículo cuarto de nuestro estatuto antimonopolístico es equivalente a la Sec. 2 de la Ley Sherman, 15 U.S.C. sec. 2. Dispone como sigue:

> Toda persona que monopolice o intente monopolizar o que se combine o conspire con cualquier otra persona o cualesquiera otras personas con el objeto de monopolizar cualquier parte de los negocios o el comercio en ... Puerto Rico, o en cualquier sector de éste, será considerada culpable de un delito menos grave. 10 L.P.R.A. sec. 260.

Es menester apuntar que, aunque el Art. 2 de la Ley Núm. 77, *supra*, sólo prohíbe los contratos, las conspiraciones o las combinaciones entre dos (2) o más entidades, el Art. 4, *supra*, prohíbe la monopolización unilateral y la tentativa unilateral de monopolización, así como la monopolización por combinación o conspiración. *ABA Antitrust Developments*, supra, pág. 109.

█ Tradicionalmente se ha definido la monopolización ilegal como la posesión de poder monopolístico (el poder para controlar precios o excluir la competencia) acompañado de un elemento de deliberación, esto es, una intención general o propósito de adquirir, usar, mantener o preservar este poder. *United States v. Grinnell*, 384 U.S. 563, 570–571 (1966); *United States v. du Pont & Co.*, 351 U.S. 377, 391 (1956); *United States v. Griffith*, 334 U.S. 100, 107 (1948); *American Tobacco v. U.S.*, 328 U.S. 781, 811 (1946); *Rural Telephone Service v. Feist Publications*,

957 F.2d 765, 767 (10mo Cir. 1992); *ABA Antitrust Developments*, supra, págs. 109 y 121–123. Por ende, se han derivado dos (2) elementos necesarios para configurar una práctica monopolística ilegal bajo la Sec. 2 de la Ley Sherman, *supra*: "(1) la posesión de poder monopolístico en el mercado pertinente y (2) la voluntaria adquisición o mantenimiento de dicho poder, distinto al crecimiento o desarrollo del negocio como consecuencia de un producto superior, mejores prácticas comerciales, o de algún accidente histórico". *United States v. Grinnell*, supra, págs. 570–571.

■ Además de prohibir, bajo ciertas circunstancias, los monopolios, el Art. 4 de la Ley Núm. 77, *supra*, también prohíbe los intentos de monopolización. Esto es, aun cuando el poder de una empresa en determinado mercado no alcance los niveles monopolísticos, ciertas prácticas exclusionarias o conducta predatoria pueden constituir una tentativa ilegal de monopolización. Generalmente se ha exigido prueba de que, primero, la empresa tenía una intención específica de monopolizar (controlando precios o destruyendo la competencia), ya sea unilateralmente o en combinación; segundo, que se incurra en conducta anticompetitiva o predatoria dirigida hacia tal propósito, y tercero, se exige que haya un mínimo de probabilidades de que dicha tentativa tenga éxito. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993); *ABA Antitrust Developments*, supra, pág. 139. Véanse, además: *Swift and Company v. United States*, 196 U.S. 375, 396 (1905); *American Tobacco v. U.S.*, supra, pág. 785; *Thurman Industries v. Pay'n Pak Stores, Inc.*, 709 F.Supp. 985, 991 (W.D. Wash. 1987).

## C. *Art. 7 de la Ley Núm. 77*

Por otro lado, el Art. 7 de la Ley Núm. 77, *supra*, prohíbe diversas prácticas relacionadas a la política de precios de una empresa. *ABA Antitrust Developments*, supra, pág. 219. Este artículo corresponde a algunos incisos de la Sec.

2 de la Ley Clayton, según enmendada por la Sec. 1 de la Ley Antidiscriminatoria de Robinson-Patman, 15 U.S.C. sec. 13, aunque no incorpora ciertas disposiciones de dicho estatuto. 15 U.S.C. secs. 13–13b y 21(a). Por tal razón, es menester exponer en términos generales lo que prohíbe nuestra ley y señalar a qué parte de la Ley Antidiscriminatoria de Robinson-Patman corresponde.

1. *Art. 7(a)*

El inciso (a) de nuestro Art. 7 (10 L.P.R.A. sec. 263(a)) prohíbe el discrimen en precio; este inciso equivale a la primera cláusula de la Sec. 2(a) de la Ley Antidiscriminatoria de Robinson-Patman, 15 U.S.C. sec. 13(a), y dispone lo siguiente:

> (a) Será ilegal el que cualquiera persona, directa o indirectamente, discrimine en precio entre distintos compradores de cosas objeto de comercio del mismo grado y calidad, cuando dichas cosas sean vendidas para uso, consumo o reventa en Puerto Rico, y cuando el efecto de tal discrimen pueda ser el de reducir sustancialmente la competencia o tender a crear un monopolio en cualquier línea de comercio en Puerto Rico o afectar, destruir o evitar la competencia con cualquier persona que hubiese concedido o a sabiendas hubiese recibido el beneficio de tal discriminación, o con cualquier cliente de uno de éstos. 10 L.P.R.A. sec. 263(a).

Esta disposición prohíbe que, en ciertas circunstancias, un vendedor discrimine en precio entre distintos compradores. *ABA Antitrust Developments*, supra, pág. 219. Este artículo prohíbe (1) una discriminación en precio (2) entre dos compradores del mismo vendedor (3) de objetos de comercio (4) del mismo grado y calidad (5) cuando el efecto de tal discrimen pueda ser el de reducir sustancialmente la competencia o tender a crear un monopolio en cualquier línea de comercio, o afectar, destruir o evitar la competencia con cualquier persona que conceda o reciba el beneficio de dicha discriminación o con algún cliente de ésta. *ABA Antitrust Developments*, supra, págs. 222 y 230;

*Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37 y 50–51 (1948).

Constituye un discrimen en precio cualquier diferencia en el precio neto que pagan dos (2) compradores al mismo vendedor. *ABA Antitrust Developments*, supra, pág. 219; *F.T.C. v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549 (1960). Tiene que haber dos (2) ventas realizadas o por lo menos dos (2) contratos válidos de venta; no basta con (i) una venta y una oferta, o (ii) una venta y una negativa a vender. ABA *Antitrust Developments*, supra, págs. 223–224.

### 2. *Art. 7(b) y (c)*

Los incisos (b) y (c) del Art. 7 (10 L.P.R.A. secs. 263(b) y (c)) prohíben los pagos o servicios por un vendedor a un comprador como contraprestación por, o en conexión con, actividades de éste relacionadas a la distribución o reventa de los productos vendidos, a menos que dichos pagos o servicios estén disponibles, en términos proporcionalmente iguales, a todos los que compitan con el comprador en la distribución de dichos productos. Estos incisos son idénticos, respectivamente, a las sec. 2(d) y 2(e) de la Ley Antidiscriminatoria de Robinson-Patman, 15 U.S.C. sec. 13(d) y (e), y disponen como sigue:

> (b) Será ilegal el que cualquier persona pague, o se obligue a pagar, o a contribuir al pago, de algo de valor a, o en beneficio de un cliente suyo, como compensación o como contraprestación por cualesquiera servicios o facilidades suplidos por o a través de ese cliente en relación con el procesamiento, manejo, venta u oferta de venta de cualquier cosa objeto de comercio, fabricada, vendida u ofrecida en venta por esa persona a menos que el pago o contraprestación esté disponible, en términos proporcionalmente iguales, a todos los clientes que compitan en la distribución de tales cosas objeto de comercio en Puerto Rico.
>
> (c) Será ilegal el que cualquier persona supla, se obligue a suplir, o contribuya a suplir, cualquier servicio o ayuda a, o para beneficio de un cliente suyo en conexión con el procesamiento, manejo, venta u oferta de venta de cualquier cosa objeto de comercio, fabricada, vendida, u ofrecida en venta por esa persona a menos que tal servicio o ayuda esté disponible en

términos proporcionalmente iguales a todos los clientes que compitan en la distribución de tales cosas objeto de comercio en Puerto Rico. 10 L.P.R.A. sec. 263(b) y (c).

 Estos incisos le prohíben a un vendedor proveer o pagar por el manejo o promoción de un producto a menos que los mismos beneficios, o unos equivalentes, se ofrezcan a todos los compradores que compiten entre sí por el producto. *ABA Antitrust Developments*, supra, pág. 219. Estas disposiciones prohíben a un vendedor el conceder descuentos o servicios a sus compradores, relacionados con la publicidad, propaganda o promoción del producto, ello sujeto a la mencionada excepción. *ABA Antitrust Developments*, supra, pág. 261. Estos artículos solamente se ocupan de descuentos o servicios relacionados con la promoción o publicidad del producto, en conexión con la reventa de dicho producto por su comprador. *ABA Antitrust Developments*, supra, pág. 262.

### 3. *Art. 7(f)*

 El Art. 7(f) de la Ley Núm. 77, *supra*, 10 L.P.R.A. sec. 263(f), dispone que será ilegal establecer precios predatorios. Dicho inciso es análogo a una porción de la Sec. 3 de la Ley Antidiscriminatoria de Robinson-Patman, 15 U.S.C. sec. 13a, y dispone lo siguiente:

> (f) Será ilegal vender u otorgar cualquier contrato para la venta de mercancías a precios irrazonablemente bajos, con el propósito de destruir la competencia o eliminar a un competidor. 10 L.P.R.A. sec. 263(f).

Como se desprende de su texto, este inciso prohíbe que se venda un producto a un precio "irrazonablemente bajo" cuando se haga con el "propósito de destruir la competencia o eliminar a un competidor". 10 L.P.R.A. sec. 263(f).

### 4. *Art. 7(d) y (e)*

 Estas dos (2) disposiciones no crean causas de acción nuevas, sino que meramente extienden la responsabi-

lidad no sólo a la parte actora sino a la parte pasiva involucrada en el acuerdo ilegal y establecen ciertas defensas disponibles al acusado de violar el Art. 7 de la Ley Núm. 77, *supra.*

El Art. 7(d), 10 L.P.R.A. sec. 263(d), corresponde a la Sec. 2(f) de la Ley Antidiscriminatoria de Robinson-Patman, 15 U.S.C. sec. 13(f), y dispone lo siguiente:

> (d) Será ilegal el que cualquier persona solicite, o a sabiendas induzca la concesión de o reciba un precio discriminatorio prohibido por el apartado (a), o un pago prohibido por el apartado (b), o un servicio o beneficio prohibido por el apartado (c), precedentes.([6])

El inciso (e) del Art. 7 de la Ley Núm. 77, *supra,* 10 L.P.R.A. sec. 263(e), establece ciertas defensas disponibles al que se le acuse de infringir los cuatro (4) incisos previos. Este inciso corresponde a algunas partes de la sec. 2(a) y (b) de la Ley Antidiscriminatoria Robinson-Patman, 15 U.S.C. sec. 13(a) y (b),([7]) y dispone lo siguiente:

> (e) En cualquier acción por violación a los apartados (a), (b), (c) o (d) precedentes podrá interponerse, como defensa, prueba de que los diferenciales concedidos por la persona acusada son concesiones por la diferencia en costo de manufactura, venta o entrega como resultado de los métodos o cantidades en que las cosas objeto de comercio son vendidas o entregadas. Nada de lo dispuesto en los incisos (a), (b) y (c) impedirá el que un vendedor pueda interponer como defensa el hecho de que el precio más bajo ofrecido por él o los servicios o facilidades que ha suplido a cualquier comprador, responden a un precio igual-

---

([6]) La Sec. 2(f), 15 U.S.C. sec. 13(f), es más limitada ya que solamente se limita a prohibir el inducir o recibir un precio discriminatorio.

([7]) La primera oración corresponde a la segunda cláusula de la Sec. 2(a) de la Ley Antidiscriminatoria de Robinson-Patman, 15 U.S.C. sec. 13(a). Según este estatuto, la defensa sólo está disponible al que acusan de infringir dicha sección, mientras que en Puerto Rico tal defensa parecería también estar disponible al que se acusa de infringir el Art. 7(b), (c) y (d) de nuestra Ley Núm. 77 de 25 de junio de 1964 (10 L.P.R.A. sec. 263(b), (c) y (d)), equivalente a la Sec. 2(d), (e) y (f) del estatuto federal, 15 U.S.C. sec. 13(a), (e) y (f).

La segunda oración del Art. 7(e), 10 L.P.R.A. sec. 263(e), corresponde a la segunda cláusula de la Sec. 2(b) de la Ley Antidiscriminatoria de Robinson-Patman, 15 U.S.C. sec. 13(b).

mente bajo de un competidor o a los servicios o facilidades ofrecidos por un competidor, siempre que el Tribunal concluya afirmativamente que ha mediado buena fe en las transacciones así efectuadas por el vendedor y que las mismas no están encaminadas a, ni facilitan, la violación o evasión de esta sección. 10 L.P.R.A. sec. 263(e).

### D. *Art. 12 de la Ley Núm. 77*

Finalmente, es importante reseñar que los demandantes acuden al tribunal amparados en el Art. 12 de la Ley Núm. 77, *supra*, el cual es equivalente en términos generales a la Sec. 4 de la Ley Clayton, 15 U.S.C. sec. 15. Dicho artículo provee una causa de acción privada, por el triple de los daños sufridos, al que se perjudique por razón de algún acto en violación a nuestra ley:

(a) Cualquier persona que sea perjudicada en sus negocios o propiedades por otra persona, por razón de actos, o intentos de actos, prohibidos o declarados ilegales por [esta Ley], salvo las secs. 259 y 261, puede demandar a causa de dichos actos ante el Tribunal Superior y tendrá derecho a recobrar tres veces el importe de los daños y perjuicios que haya sufrido, más las costas del procedimiento y una suma razonable para honorarios de abogado. 10 L.P.R.A. sec. 268(a).

Como se puede observar de su simple lectura, el texto de esta disposición establece tres (3) requisitos para que una persona se pueda valer de ella para ser indemnizada: (1) que la persona sea perjudicada en sus negocios o propiedades (2) por razón de (3) actos o intentos de actos prohibidos por nuestra ley (a menos que se trate de conducta violatoria de su tercer o quinto artículo). Véase *ABA Antitrust Developments*, supra, págs. 386 y 393.

En las últimas dos (2) décadas, el segundo requisito que según el texto de la disposición sólo requiere un nexo causal fáctico entre los daños que se prueben y las actuaciones ilegales, ha sido objeto de complejas y novedosas interpretaciones en el ámbito federal. Bajo la Sec. 4 de la Ley Clayton, *supra*, equivalente a nuestro Art. 12, *supra*, la juris-

prudencia federal ha concluido que es necesario, para valerse de esta sección, que un demandante pruebe daño antimonopolístico (*antitrust injury*) así como legitimación activa antimonopolística (*antitrust standing*). Esta doctrina no se ha aplicado de un modo consistente, uniforme y coherente. *Kansas v. Utilicorp United Inc.*, 497 U.S. 199 (1990); *Atlantic Richfield Co. v. USA Petroleum Co.*, supra; *Associated General Contractors v. Carpenters*, 459 U.S. 519 (1983); *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337–338 (1979); *Pfizer Inc. v. India*, 434 U.S. 308, 313–314 (1978); *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477 (1977); *Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972); *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 114 esc. 9 (1969); *ABA Antitrust Developments*, supra, págs. 394 y 399–402. Véase, también, J.F. Hart, *Standing Doctrine in Antitrust Damage Suits, 1890–1975: Statutory Exegesis, Innovation, and the Influence of Doctrinal History*, 59 Tenn. L. Rev. 191 (1992).

Al aprobarse nuestra ley en 1964, el estado de estas doctrinas bajo el derecho federal era ambiguo dado que el Tribunal Supremo federal no se había expresado tajantemente al respecto y las expresiones de los tribunales inferiores eran conflictivas. Hart, *supra*, págs. 192–197 y 229–259. No obstante, el Tribunal Supremo federal sí había hecho pronunciamientos que respaldaban una teoría liberal de legitimación bajo la Sec. 4 de la Ley Clayton. *Radiant Burners v. Peoples Gas Co.*, 364 U.S. 656, 659–660 (1961); *Radovich v. Nat. Football League*, supra, págs. 453–454; *Mandeville Farms v. Sugar Co.*, 334 U.S. 219, 236 (1948). Véase Hart, *supra*, págs. 249–254. Encontramos persuasivos los siguientes pronunciamientos del Tribunal Supremo federal:

> In sum, in the absence of some articulable consideration of statutory policy suggesting a contrary conclusion in a particular factual setting, [87 4 of the Clayton Act should be applied] in

accordance with its plain language and its broad remedial and deterrent objectives. *Blue Shield of Virginia v. McCready*, supra, pág. 473. Véase Hart, *supra*, pág. 257.

Resolvemos que no es necesario, para satisfacer el requisito de "por razón de", que la parte demandante pruebe algo más que una relación causal fáctica entre el daño sufrido y la violación de la ley; es decir, basta que, como consecuencia de la infracción a la ley, el demandante haya sufrido daño.

En este sentido, conforme a nuestra doctrina civilista, el daño es " 'todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual ha de responder otra' ". J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1983, T. II, Vol. III, pág. 179 (citando a J. Santos Briz, *Derecho de Daños*, Madrid, 1963, pág. 107). Por ende, se incluye en el concepto tanto el daño emergente como el lucro cesante; tanto el daño patrimonial como el moral. Puig Brutau, *op. cit.*, págs. 181–189.

## IV

Antes de resolver si procedía la desestimación de la presente demanda por ésta no exponer una reclamación que justifique la concesión de un remedio, reiteramos que damos por ciertas todas las alegaciones fácticas de dicha demanda. Sin perder de vista este principio fundamental, emprendemos la tarea de evaluar la corrección de la actuación del foro de instancia al desestimar en su totalidad la demanda instada en el caso de marras.

Al examinar las alegaciones de la demanda junto a los elementos de las causas de acción incoadas, concluimos que erró el tribunal de instancia al desestimar la demanda bajo el fundamento de que no se justificaba la concesión de un remedio. De las alegaciones ser probadas, estos hechos, junto a la evidencia que se pueda presentar para apoyar

las conclusiones de derecho correspondientes, serían suficientes para que se pudiera concluir que se han configurado violaciones a los Arts. 2, 4 y 7(a) de la Ley Núm. 77, *supra*, así como al Art. 1802 del Código Civil, *supra*.

El contrato de 3 de diciembre de 1982 podría constituir una restricción irrazonable a los negocios en Puerto Rico en violación al Art. 2 de la Ley Núm. 77, *supra*. Dicho contrato impedía que los competidores de Puerto Rico Fuels intentaran vender su producto a Empire Gas, a menos que a Puerto Rico Fuels no le fuera viable económicamente vender al precio más bajo de entre ciertos competidores de Puerto Rico Fuels. También impedía que los competidores de Empire Gas pudieran comprar el gas de Puerto Rico Fuels sin el consentimiento previo de Ramón González.

██ Estos acuerdos representan lo que se conoce como *requirements contracts*, un tipo de entre los llamados *exclusive dealing agreements*.([8]) Aunque no se han considerado irrazonables per se bajo la Sec. 1 de la Ley Sherman, *supra*, sí están sujetos al análisis de todas las circunstancias (llamado por la jurisprudencia federal el *rule of reason*) para determinar si son restricciones "irrazonables". *Tampa Electric Co. v. Nashville Co.*, 365 U.S. 320, 333 (1961); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236–238 (1er Cir. 1983). De acuerdo con ese análisis, el demandante tiene que demostrar que el impacto anticompetitivo del acuerdo es al menos sustancial; es decir, que las oportunidades de otros vendedores de permanecer o entrar en el mercado pertinente se verán limitadas significativamente. Esto requiere acudir a datos económicos apropiados sobre el mercado en cuestión. Se tomará en cuenta

---

([8]) Estos contratos se han definido como aquellos mediante los cuales "the buyer will purchase, and ... the seller will supply, the buyer's requirements of particular goods at a specified price for a definite period of time." W.E. Stockhausen, *The Commercial and Anti-Trust Aspects of Term Requirements Contracts*, 23 N.Y.U. L.Q. Rev. 412 (1948).

... the relative strength of the parties, the proportionáte volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. *Tampa Electric Co. v. Nashville Co.*, supra, pág. 329. Véanse, además: *Barry Wright Corp. v. ITT Grinnell Corp.*, supra, págs. 236–237; *Tampa Electric Co. v. Nashville Co.*, supra, págs. 329 y 333–334. Sobre estos contratos y su validez bajo la Ley Sherman, véanse: *Tampa Electric Co.*, supra, págs. 327–329; *Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303–1304 (9no Cir.), *cert.* denegado, 459 U.S. 1009 (1982); *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211–212 (9no Cir. 1987); *Westman Com'n Co. v. Hobart Intern., Inc.*, 796 F.2d 1216, 1223–1227 y 1229 (10mo Cir. 1986); *Seagood v. Jerrico, Inc.*, supra, pág. 1569; *Taggart v. Rutledge*, 657 F.Supp. 1420, 1443–1445 (1987).

Conforme a lo discutido, es imperativo que el demandante defina con precisión cuál es el mercado pertinente en el cual se está restringiendo irrazonablemente el comercio y pruebe cómo es que se está afectando la competencia en dicho mercado: "Proof that a defendant's activities had an impact upon competition in a relevant product market is an absolutely essential element of a rule of reason case." *Thurman Industries v. Pay'n Pak Stores*, supra, pág. 992; *Taggart v. Rutledge*, supra, págs. 1443–1445; L.A. Sullivan, *Handbook of the Law of Antitrust*, Minnesota, Ed. West Publishing Co., 1977, págs. 186–192; 1 *Areeda & Turner, Antitrust Law* Sec. 9.

De hecho, debido a sus características favorables a la libre competencia, estos acuerdos son generalmente considerados válidos. *ABA Antitrust Developments*, supra, págs. 65–67. y 95; *Tampa Electric Co. v. Nashville Co.*, supra, pág. 334; *Standard Oil Co. v. United States*, 337 U.S. 293, 306–307 (1949); *City of Chanute, Kan. v. Williams Natural Gas Co.*, 955 F.2d 641, 651–652 (10mo Cir. 1992); *Westman Com'n Co. v. Hobart Intern., Inc.*, supra, págs. 1226–1227. Por ejemplo, el Tribunal Supremo federal ha expresado que estos acuerdos

... may well be of economic advantage to buyers as well as to sellers, and thus indirectly of advantage to the consuming public. In the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand. From the seller's point of view, requirementes contracts may make possible the substantial reduction of selling expenses, give protection against price fluctuations, and —of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified— offer the possibility of a predictable market. (Escolio omitido.) *Standard Oil Co. v. United States*, supra, págs. 306–307.[9]

■ No obstante, se le debe conceder a los demandantes la oportunidad de traer prueba que pueda demostrar la irrazonabilidad de los contratos a la luz de su efecto sustancialmente adverso sobre la libre competencia. En cierta medida, esta evidencia sólo puede obtenerse mediante los mecanismos de descubrimiento de prueba. Debido a la complejidad inherente a este tipo de reclamaciones, no es aconsejable, de ordinario, desestimarlas sin proveer una oportunidad al demandante de probar su caso o, al menos, pasar por el procedimiento de descubrimiento de prueba.

Además, la regalía de centavo y medio (1.5¢) para Ramón González, fijada en el contrato, por cada galón de gas

---

[9] "There are several reasons why it is procompetitive to permit a manufacturer to limit the number of outlets that distribute its products. A few are readily apparent. First, when a manufacturer limits the number of its distributors, it may reduce its distribution costs by allowing each distributor to achieve economies of scale and to spread out fixed costs over a large amount of products. Second, refusals to deal may facilitate the entry of new manufacturers into the market. The prospect of limited intrabrand competetion that results from restricted distribution may encourage distributors to make the investment necessary to carry a new manufacturer's product. Third, limiting the number of outlets that distribute a product may encourage distributors to provide promotional activities, consumer information, and product service. These activities may in turn lead to increased interbrand competition. When a manufacturer limits the number of retail outlets for its products, it ensures that competing sellers of its products will not get a free ride, or benefit from the promotions or service provided by other distributors. Finally, restricting distribution can reduce transaction costs by permitting a manufacturer to deal only with distributors with whom it believes it can develop an efficent working relationship." (Citas omitidas.) *Westman Com'n Co. v. Hobart Intern., Inc.*, 796 F.2d 1216, 1227 (10mo Cir. 1986).

que Puerto Rico Fuels vendiera en Puerto Rico, no tiene otro propósito que provocar que Puerto Rico Fuels vendiera su producto más caro a los competidores de Empire Gas, inflando el precio artificialmente. Este tipo de práctica también podría constituir una restricción irrazonable a los negocios en Puerto Rico, además de un discrimen en precio prohibido por el Art. 7(a) de la Ley Núm. 77, *supra*.

De igual manera, el contrato de 27 de febrero de 1986 también podría constituir una restricción ilegal a los negocios en Puerto Rico, así como una violación del Art. 7(a) de la Ley Núm. 77, *supra*, relativo a precios discriminatorios. Mediante dicho contrato dos (2) de los demandados, Liquilux y Empire Gas, se aseguran de obtener un precio rebajado de parte de Puerto Rico Fuels, por el gas que les compren, en comparación con el precio que tendrían que cobrarles a los únicos otros dos (2) compradores a quienes, bajo el acuerdo, Puerto Rico Fuels les podría vender.

Por otra parte, los contratos mediante los cuales los demandados compraban cilindros que alegadamente no cumplían con los requisitos legales de seguridad y mediante los cuales mandaban a reparar cilindros por personas no autorizadas, también podrían constituir una restricción irrazonable a los negocios en Puerto Rico, en violación del Art. 2 de la Ley Núm. 77, *supra*. Esto es así, ya que ello constituye una práctica que ilegítimamente impide que la compañía demandante haga negocios, en detrimento de la competencia que se quiere proteger. Legalmente, los demandados no tenían la opción de comprar cilindros que no cumplían ciertos requisitos legales ni podían encargarles a personas no autorizadas dichos cilindros. No obstante, al ejercitar de todos modos dicha opción, naturalmente se pone en desventaja en la práctica de sus negocios a la empresa demandante, la cual sí cumplía con los requisitos legales pertinentes para vender y reparar cilindros para envasar gas propano.

Todos los prácticas, contratos y actuaciones menciona-
das también pueden ser evidencia de un intento (tentativa)
de los demandados de monopolizar el mercado de venta de
gas propano. La causa de acción bajo el Art. 4 de la Ley
Núm. 77, *supra*, tampoco debe desestimarse; los deman-
dantes tendrán la oportunidad de descubrir prueba que de-
muestre los elementos constitutivos de las causas de acción
contenidas en dicha disposición. Será importante que los
demandantes definan con exactitud cuál es el mercado mo-
nopolizado, tanto en términos del producto como de la re-
gión geográfica involucrada. *Thurman Industries v. Pay'n
Pak Stores Inc.*, supra, pág. 990; *M.A.P. Oil Co. v. Texaco
Inc.*, 691 F.2d 1303, 1306 (9no Cir. 1982).

Por otro lado, no se han alegado hechos suficientes para
inferir una posible causa de acción bajo el Art. 7(b), (c) y (f)
de la Ley Núm. 77, *supra*. Confirmamos al tribunal de ins-
tancia, en cuanto desestimó las reclamaciones fundadas en
estos incisos, sobre la base de que la demanda no aducía
hechos que justificaran la concesión de un remedio. Los
demandantes no alegan hecho alguno que remotamente
pueda ser ilegal bajo estas disposiciones; no alegaron que
el demandado reciba pagos o servicios de parte de Puerto
Rico Fuels en conexión a la reventa del gas propano que le
compraban ni tampoco exponen hecho concreto alguno que
pueda dar paso a una inferencia de que los demandados
vendían el gas a precios irrazonablemente bajos o predato-
rios (bajo el costo).

Finalmente, resolvemos que no procedía desestimarse
la demanda por no justificarse la concesión de un remedio
bajo el Art. 1802 del Código Civil, *supra*. Se es responsable
civilmente bajo dicha disposición si el demandante esta-
blece que ha sufrido un daño causado por la conducta ne-
gligente o culposa del demandado. En este caso particular,
se podría inferir de los hechos alegados que el demandado
incurrió en conducta culposa que pudo causar daños a los

demandantes. La alegada conducta consistió en la violación de diversos requisitos legales en relación con el manejo, la reparación y la venta de cilindros para envasar gas propano. Esta conducta ilegal pudo poner al demandante en una condición de desventaja, al no poder competir en el mercado de manejo, venta y reparación de estos cilindros, ello debido a que al cumplir con toda la reglamentación vigente, incurrían en costos más altos que el demandado.

Resolvemos, además, que no procede desestimar esta demanda por motivo de que de las alegaciones surja la imposibilidad de que la parte demandante establezca el nexo causal fáctico necesario entre la conducta supuestamente ilegal de los demandados y el daño sufrido por aquél, nexo requerido por el Art. 12 de la Ley Núm. 77, *supra.* Habiéndose alegado con suficiente claridad que dicho nexo causal existe y sin surgir de las alegaciones que, como cuestión de derecho, este vínculo no pueda ser establecido, este es un asunto que propiamente deberá ventilarse en juicio. Esta conclusión no releva a la parte actora de tener que demostrar la existencia del daño según lo requiere el texto del artículo, así como el nexo causal, real y no especulativo entre la violación de ley y el daño alegado. Tiene que aportarse una prueba concreta que demuestre cómo es que el daño es atribuible, de manera al menos sustancial, a la actuación ilegal de los demandados. Meras alegaciones, conjeturas y especulaciones sobre dicho nexo causal no bastan para configurar la prueba requerida.

Es menester repetir y enfatizar que nuestra decisión de hoy no significa que los demandantes puedan prevalecer en su reclamo antimonopolístico con solamente probar la existencia de los contratos que se describen en la demanda. Es necesario que aporten prueba para establecer los elementos constitutivos de las causas de acción que incoan. Diversos mecanismos ya mencionados, tales como la moción que solicita exposición más definida, la moción que solicita sen-

tencia sumaria, la celebración de conferencias con antelación a juicio, el descubrimiento de prueba y la moción para solicitar una desestimación contra la prueba, están a la disposición del demandado y disponibles al foro de instancia para que éste mantenga un control razonable del caso.

Por los fundamentos antes expuestos, *procede que se revoque la sentencia recurrida en cuanto desestimó la demanda por no aducir hechos que justificaran la concesión de un remedio bajo los Arts. 2, 4 y 7(a) de la Ley Núm. 77, supra, y bajo el Art. 1802 del Código Civil, supra, y confirmarse en cuanto desestimó la demanda por ésta no aducir hechos que justificaran la concesión de un remedio bajo las demás disposiciones de la Ley Núm. 77, supra, específicamente invocadas por los demandados. Se devuelve el caso para procedimientos compatibles con lo aquí resuelto.*

El Juez Asociado Señor Fuster Berlingeri concurrió sin opinión escrita. El Juez Presidente Señor Andréu García no intervino. La Juez Asociada Señora Naveira de Rodón se inhibió.