El Juez Asociado Señor Rebollo López
emitió la opinión del Tribunal.
Los hechos que originan el recurso ante nuestra consideración se retrotraen al 4 de agosto de 2000 cuando la Asamblea Legislativa aprobó la Ley de la Reserva Agrícola del Valle del Coloso, con el propósito de proteger unos terrenos en la zona noroeste de la isla que poseen condiciones idóneas para la agricultura. Ley Núm. 142 de 4 de agosto de 2000 (5 L.P.R.A. see. 1731 et seq.).
Dicho estatuto dispuso que la Junta de Planificación debía, en coordinación con el Departamento de Agricultura, promulgar y adoptar un Reglamento de Zonificación Especial que ordenara las fincas comprendidas dentro del denominado Valle del Coloso. Además, la Ley Núm. 142 prohibía a la Junta de Planificación, a la Administración de Reglamentos y Permisos (A.R.Pe.) y a los gobiernos municipales autorizar segregaciones para la creación de fincas menores de diez cuerdas en el área protegida.
No obstante, el 8 de julio de 2003 A.R.Pe. aprobó la segregación de la propiedad aquí en controversia, a solicitud de la Comunidad Agrícola Bianchi. La propiedad segregada está situada en el barrio Guanábano de Aguada y cuenta con un área superficial de 5,735.5265 m.c., equivalente a 1.4593 cuerdas. En dicho momento, la Autoridad de Tierras era arrendataria de los predios de terreno que for-man la Reserva Agrícola del Valle del Coloso.
En febrero de 2004 se presentó en el Departamento de Estado el plano de los terrenos protegidos y el Reglamento de Zonificación Especial para las reservas agrícolas de Puerto Rico. Este último entró en vigor el 13 de febrero de 2004. Un mes más tarde, la codemandada Ruiz Santiago *415 adquirió, mediante una escritura de segregación, liberación y compraventa, el solar segregado que pertenecía a la Comunidad Agrícola Bianchi.
Por otra parte, el 9 de julio de 2004 la Autoridad de Tierras presentó una petición de expropiación forzosa para adquirir tres predios de terreno para destinarlos al proyecto de la Reserva Agrícola del Valle del Coloso, emplazándose con copia de dicha petición a la Comunidad Agrícola Bianchi. Unos días más tarde, la Sala de Expropiaciones del Tribunal de Primera Instancia de San Juan aprobó la solicitud de expropiación forzosa, en el Caso Civil Núm. KEF-2004-746(1002). Es menester señalar que entre los terrenos expropiados se encontraba la propiedad en controversia.
A pesar de ello, el 16 de agosto de 2005 la señora Ruiz Santiago vendió el predio segregado a Moreno & Ruiz Developers Corporation (Moreno & Ruiz). Luego de efectuada la compraventa, esta corporación adquirente sometió una solicitud a A.R.Pe. para la segregación de dos solares, la cual fue aprobada parcialmente, mediante resolución de 20 de septiembre de 2005. Aproximadamente tres meses después, y con el fin de confirmar la ubicación y delimitación del terreno segregado, el agrimensor William Guzmán Morales, jefe de la División de Agrimensura de la Autoridad de Tierras, visitó el lugar e identificó la propiedad dentro del plano de expropiación sometido. Además, emitió una certificación e ilustración de la ubicación del área afectada. Un año más tarde, el mismo agrimensor realizó una segunda certificación en la que reiteró lo expresado en la primera.
Luego de que Moreno & Ruiz hiciera caso omiso a las solicitudes para que cesara de hacer movimientos de terreno en la propiedad segregada y expropiada, el 13 de febrero de 2006 la Autoridad de Tierras presentó una demanda sobre injunction preliminar y permanente, y daños y peijuicios contra Moreno & Ruiz, Comunidad Agrícola *416 Bianchi y Teresa Ruiz Santiago ante el Tribunal de Primera Instancia, Sala Superior de Aguada. En ésta adujo que el terreno segregado era parte integral de la Reserva Agrícola del Valle del Coloso y, por ende, de la finca por ella expropiada, razón por la cual el terreno en controversia le pertenecía a dicha agencia y al Estado Libre Asociado. Además, la Autoridad de Tierras argumentó que los permisos de segregación otorgados por A.R.Pe., tanto a la Comunidad Agrícola Bianchi como a Moreno & Ruiz, eran inválidos por ser contrarios a la Ley Núm. 142, ante, y a la política pública vigente al momento de emitirlos, y que por tal razón, las escrituras de segregación eran nulas. En la alternativa, la agencia estatal alegó la nulidad de las escrituras de segregación y compraventa, otorgadas a favor de los codemandados Ruiz Santiago y Moreno & Ruiz, por haberse suscrito con posterioridad a que entrara en vigor el Reglamento de Zonificación Especial para las reservas agrícolas de Puerto Rico.
Por otra parte, la Autoridad de Tierras sostiene que la Comunidad Agrícola Bianchi y la señora Ruiz Santiago actuaron con conocimiento de las restricciones existentes en la Reserva Agrícola del Valle del Coloso, por lo que sabían desde su autorización que las escrituras otorgadas eran nulas ab initio así como que las segregaciones obtenidas eran contrarias a la Ley Núm. 142, ante. Fundamentó esto en que la Comunidad Agrícola Bianchi era, al momento de solicitar la segregación, la arrendadora de la Autoridad de Tierras con respecto a los predios protegidos([1]) y que la señora Ruiz Santiago se desempeñaba como empleada de A.R.Pe. en las mismas oficinas donde se expidieron los permisos en controversia. Por otro lado, nos señala que las *417 vistas públicas para la preparación del Reglamento de Zonificación Especial habían sido celebradas por la Junta de Planificación los días 15 y 19 de febrero de 2002 y 12 y 13 de febrero de 2003, eso es, antes de la aprobación de la segregación.
Añade la agencia que Moreno & Ruiz indujo a error a A.R.Pe. en la obtención de los permisos de segregación, al calificar la zona como RpC2-III E-5, siendo la calificación correcta AR-2. Finalmente, señala la agencia que este mismo codemandado comenzó a remover, ilegalmente, la corteza terrestre del terreno objeto de la controversia, provocando que el suelo se erosionara, lo que ha causado daños sustanciales que pueden ser irreparables. Alegadamente dicha conducta, a su vez, le ha causado perjuicios a la propiedad e intereses de la Autoridad de Tierras al no permitirle el libre disfrute de su derecho.
En conclusión, la Autoridad estimó que las actuaciones conjuntas, coordinadas o independientes de todos los demandados, que consistieron en efectuar segregaciones ilegales y hacer movimientos de terreno afectando la capa de corteza terrestre de una propiedad del Estado, contribuyó, asistió, facilitó y afectó adversamente la Reserva Agrícola del Valle del Coloso. Por consiguiente, sostiene que todos los demandados son solidaria, personal y mancomunadamente responsables a la parte demandante en daños. Según lo anterior, la Autoridad de Tierras solicitó al tribunal de instancia que ordenara, además de la remuneración económica por los daños y perjuicios sufridos, el cese y desista de todo tipo de actividades sobre el suelo protegido, ya que se estaba afectando la integridad de la Reserva Agrícola del Valle del Coloso.
Luego de varios incidentes procesales, que incluyeron una vista evidenciaría en relación con la solicitud de la orden de cese y desista, el tribunal declaró “con lugar” dicha solicitud. Posteriormente, la Comunidad Agrícola Bianchi solicitó la desestimación de la reclamación en su contra debido a que la demanda no exponía una reclama *418 ción que justificara la concesión de un remedio. Adujo que de las alegaciones de la demanda surgía que le había vendido a Ruiz Santiago el terreno objeto de esta controversia tres meses antes de que la Autoridad de Tierras presentara la petición de expropiación. Añadió que no era parte de la compraventa que se efectuó entre Ruiz Santiago y Moreno & Ruiz. Por lo tanto, sostuvo que de los hechos bien alegados en la demanda no surgía una causa de acción en su contra.
La Autoridad de Tierras se opuso a la desestimación alegando que la segregación del predio de terreno de 1.4593 cuerdas, propiedad de la Comunidad Bianchi, fue autorizada por A.R.Pe. después de que se aprobara la Ley de la Reserva del Valle del Coloso y en contravención con ésta, ya que ésta disponía que no se podían aprobar segregaciones de menos de diez cuerdas. En la alternativa, la referida agencia adujo que la compraventa entre la Comunidad Agrícola Bianchi y Ruiz Santiago era nula, ya que la escritura fue otorgada con posterioridad a la aprobación del Reglamento de Zonificación Especial, el cual proveía para que la segregación de terrenos en la Reserva no fuera menor a diez cuerdas en un área zonificada AR-2, como es el terreno en controversia en el presente caso.
En una segunda solicitud de desestimación, la Comunidad Agrícola Bianchi añadió que al momento de A.R.Pe. autorizar la segregación del terreno no estaba vigente el Reglamento de Zonificación Especial ni el plano de delimitación del área de la reserva, por lo que la reserva no había sido definida. La Autoridad de Tierras replicó que lo que hizo el referido reglamento fue ampliar la cantidad de tierras que especifica la Exposición de Motivos de la ley que crea la reserva.
El 4 de enero de 2007 el tribunal de instancia emitió una sentencia parcial, en la cual desestimó la reclamación contra la Comunidad Agrícola Bianchi respecto a la demanda incoada por la Autoridad de Tierras. Además, dicho foro *419 dejó sin efecto la orden de paralización de las obras que realizaba Moreno & Ruiz en los terrenos en controversia, al concluir que tal causa de acción era accesoria a la de la Comunidad Agrícola Bianchi, ya que se fundamentaba en que los terrenos eran parte de la finca expropiada.
Entendió el foro primario que la Ley de la Reserva del Valle del Coloso no definió el ámbito territorial protegido ni el área comprendida dentro de ésta. Señaló que el Art. 2 de la Ley Núm. 142 (5 L.RR.A. see. 1732) requería que se aprobara un Reglamento de Zonificación Especial, el cual entró en vigor después de la aprobación de la segregación por A.R.Pe. Interpretó el tribunal de instancia que el Art. 5 de la referida Ley Núm. 142 (5 L.P.R.A. see. 1735) requería un plano que deslindara la reserva, el cual no se había preparado, por lo que no había forma física para determinar cuál propiedad ubicaba dentro de los límites de ésta. En virtud de lo anterior, el tribunal de instancia concluyó que no había prohibición alguna que evitara aprobar la segregación del terreno propiedad de la Comunidad Agrícola Bianchi.
Insatisfecha con la decisión, la Autoridad de Tierras acudió al Tribunal de Apelaciones, reiterando su posición contra la desestimación de la demanda y el levantamiento de la orden de cese y desista. El 20 de abril de 2007 el foro apelativo intermedio dictó sentencia en la cual confirmó la del tribunal de instancia en todos sus extremos.
Aun inconforme con el dictamen, la Autoridad de Tierras acudió —mediante un recurso de certiorari— ante este Tribunal, imputándole al foro apelativo intermedio haber errado al
... CONFIRMAR LA SENTENCIA PARCIAL DEL TRIBUNAL DE PRIMERA INSTANCIA QUE DESESTIMARA LA ACCIÓN INCOADA ADUCIENDO QUE NO HAY CONTRO-VERSIA SOBRE HECHOS POR HABER LA CODEMAN-DADA COMUNIDAD AGRÍCOLA BIANCHI INC., VENDIDO EL PREDIO EN CONTROVERSIA AL NO EXISTIR PROHI- *420 BICION LEGAL PARA ELLO, Y CONSECUENTEMENTE DEJAR SIN EFECTO LA PARALIZACIÓN DE OBRAS DE LA CODEMANDADA CORPORACIÓN MORENO-RUIZ DEVELOPERS. Petición de certiorari, pág. 10.
Expedimos el recurso y ordenamos la paralización de toda construcción en las tierras en controversia hasta que otra cosa se dispusiera. Estando en condiciones de resolver, procedemos a hacerlo.
I
La Constitución del Estado Libre Asociado de Puerto Rico establece, en el Art. VI, Sec. 19, L.P.R.A., Tomo 1, ed. 1999, pág. 421, que “[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad”. Véanse: Maldonado v. Junta Planificación, 171 D.P.R. 46 (2007); Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908 (1998); Paoli Méndez v. Rodríguez, 138 D.P.R. 449 (1995).
Conforme a dicho mandato constitucional, hemos expresado que “ha sido política pública del Gobierno del Estado Libre Asociado de Puerto Rico dirigir el proceso de planificación de nuestra isla hacia un desarrollo integral sostenible que asegure el juicioso uso de las tierras y fomente la conservación de los recursos naturales para el disfrute y beneficio de todos”. A.R.Pe. v. Rivera, 159 D.P.R. 429, 437 (2003), citando el documento Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico, 23 R.P.R. see. 650.821 et seq. Véase, además, Maldonado v. Junta Planificación, ante.
De acuerdo con la política pública antes mencionada, la Asamblea Legislativa, en reconocimiento de la importancia del sector agrícola como actividad necesaria para producir alimentos, generar empleos y conservar el ambiente, y con el fin de promover el uso de los terrenos agrí *421 colas de alta productividad, aprobó, entre otras, la Ley para la Reserva Agrícola del Valle del Coloso, Ley Núm. 142 de 4 de agosto de 2000, ante, con el propósito de proteger los terrenos de alto rendimiento agrícola comprendidos dentro del Valle del Coloso. En particular, el Art. 1 de la referida ley, que declaró el Valle del Coloso como reserva agrícola, establece:
El Gobierno de Puerto Rico, reconoce la agricultura como una actividad de vital e imperiosa importancia para el bienestar económico del país y declara como política pública la reservación de los terrenos comprendidos dentro del Valle del Coloso como reserva agrícola. La Asamblea Legislativa de Puerto Rico reconoce que los terrenos que componen el Valle del Coloso, en posesión de [características] físicas, topográficas y geológicas idóneas para la agricultura y ecoturismo deben destinarse para uso exclusivo de la producción agrícola y desarrollo ecoturístico [y,] en consecuencia de ello, declara esta zona como reserva agrícola del país asegurando, además, el fortalecimiento de la zona de noroeste de la Isla. 5 L.P.R.A. see. 1731.
Por otro lado, y con la intención de describir cuáles serían los terrenos protegidos, la Ley Núm. 142, además de afirmar que la zona albergada es aquella conocida como el Valle del Coloso, explicó en la Exposición de Motivos:
El Valle [de Coloso] es un área comprendida por unas 2,985 cuerdas de terreno que hoy poseen intacta su capacidad agrícola para la producción de caña de azúcar, frutos menores.... El Valle del Coloso está formado por una extensa franja de terreno comprendida por los límites territoriales de los municipios de Aguada, Aguadilla y Moca. De la cabida total de 2,985 cuerdas con alto potencial agrícola. De éstas, sólo 1,700 cuerdas se encuentran cultivadas con caña de azúcar. Las mismas se distribuyen de la siguiente manera: 113 cuerdas en el Municipio de Moca, 354 cuerdas en el Municipio de Aguadilla y 1,233 cuerdas en el Municipio de Aguada. La carretera número 2 atraviesa el Valle de Coloso.
La mayoría de los terrenos del Valle de Coloso pertenecen al sector privado. La Autoridad de Tierras de Puerto Rico es propietaria de 250 cuerdas de terreno. De éstas, 82.0 cuerdas son operadas por la entidad Agro Industria Azucarera del Oeste, Inc.....
*422 Los suelos en su mayoría son de aluvión por tratarse de una zona bañadas [sic] por importantes cuerpos de agua.....
El Valle de Coloso ha sido catalogado en la Asociación de los llanos aluviales según el Servicio de Conservación de Recursos Naturales del Departamento de Agricultura de Estados Unidos. 2000 (Parte 1) Leyes de Puerto Rico 961-962.
Así las cosas, el legislador impuso a ciertas agencias y municipios unas prohibiciones sobre su poder de otorgar permisos de uso, segregación, construcción, con relación a los terrenos protegidos. Al respecto, el Art. 3 de la Ley Núm. 142, dispone:
Se prohíbe a la Junta de Planificación, a la Administración de Reglamentos y Permisos y a los gobiernos municipales, cuyos lindes territoriales ubiquen dentro del área comprendida por la Reserva Agrícola del Valle del Coloso ... la aprobación de consultas de ubicación, autorizar desarrollar, otorgar permiso de construcción o de uso que esté en contravención con la política pública declarada en [el Artículo 1 de esta Ley].
Además, dichas agencias y organismos gubernamentales no podrán autorizar segregaciones para la creación de fincas menores de diez (10) cuerdas en el área designada en la Resolución de Zonificación Especial, señalada en [el Art. 2 de esta Ley]. 5 L.P.R.A. see. 1733.
En el Art. 2 de la Ley Núm. 142, ante, se le ordena a la Junta de Planificación a que, en coordinación con el Departamento de Tierras, realice los estudios necesarios de las fincas comprendidas dentro del denominado Valle del Coloso, con el propósito de ordenar los terrenos protegidos mediante la promulgación y adopción de una resolución de zonificación especial. Además, el Art. 5 de la ley, 5 L.P.R.A. see. 1735, indica que, como parte del plan para confeccionar e implantar el desarrollo agrícola y el ecoturismo del Valle del Coloso, las agencias concernidas deben, entre otros criterios, identificar con exactitud la delimitación territorial de todos los terrenos que comprende el Valle del Coloso y establecer el deslinde específico del área geográfica que será designada para uso agrícola.
*423 En cumplimiento con la Ley Núm. 142, ante, el 5 de diciembre de 2003 la Junta de Planificación adoptó el Reglamento de Zonificación Especial para las Reservas Agrícolas de Puerto Rico Núm. 6771 (Reglamento de Planificación Núm. 28) de 7 de febrero de 2004. Los mapas de delimitación y zonificación especial para las reservas agrícolas de los valles de Lajas, Coloso y Guanajibo, se hicieron formar parte integral del reglamento. Véase J.P. v. Frente Unido I, 165 D.P.R. 445 (2005), reconsiderado en J.P. v. Frente Unido II, 165 D.P.R. 910 (2005). En el citado reglamento se amplió la cantidad de terrenos de la Reserva Agrícola del Valle del Coloso a aproximadamente 3,182 cuerdas, esto es, 197 cuerdas adicionales a las que inicialmente señalaba la ley. Ello, porque el legislador ordenó a la Junta de Planificación a incluir en la Resolución de Zonificación Especial aquellas tierras que colindasen con las identificadas de valor agrícola y que sirven de zona de amortiguamiento.
II
La Ley Orgánica de la Administración de Reglamentos y Permisos, Ley Núm. 76 de 24 de junio de 1975, según enmendada, en su Art. 3 (23 L.P.R.A. sec. 71b(h)), define lotificación de la manera siguiente:
(h) Lotificación— Es la división o subdivisión de un solar, predio o parcela de terreno en dos o más partes, para la venta, traspaso ... y, además, una mera segregación.
Por otro lado, el Art. 22 de la mencionada ley, 23 L.P.R.A. sec. 71u, dispone que a partir de su vigencia será necesario un permiso de A.R.Pe. para poder efectuar una lotificación y menciona que, como norma general, no tendrá eficacia cualquier escritura pública en que se efectúe una lotificación si ésta no ha sido sometida y aprobada previamente por A.R.Pe. Véase, además, Banco Comercial v. Registrador, 118 D.P.R. 773 (1987).
*424 Por su parte, el Art. 3 del Reglamento de Lotificación, Reglamento de la Junta de Planificación Núm. 3, exime del permiso de A.R.Pe. a aquellas lotificaciones de fincas en la zona rural para fines agrícolas, cuando el área, tanto del remanente como de cada una de las nuevas fincas, resulte ser de veinticinco cuerdas o más. En todos los demás casos, para segregar una propiedad, es requisito tener un permiso válido de A.R.Pe.
Por último, debemos señalar que la anteriormente citada Ley Orgánica de A.R.Pe. dispone que la agencia se guiará, al considerar subdivisiones de terrenos para lotificaciones simples, por cualesquiera leyes aplicables y por la “Conveniencia de evitar subdivisiones en áreas que no estén listas para tales desarrollos debido a ... la importancia agrícola o de excepcional belleza de los terrenos; la susceptibilidad a inundaciones de los terrenos ...”. 23 L.P.R.A. sec. 71h.
III
Aunque de carácter fundamental, el disfrute de la propiedad no es un derecho absoluto. Culebra Enterprises Corp. v. E.L.A., 127 D.P.R. 943 (1991). En beneficio del bienestar general, la Asamblea Legislativa puede establecer restricciones a tal derecho propietario entre las que se encuentra el poder de expropiación del soberano, que a su vez tiene unas limitaciones. De acuerdo con el mandato constitucional, “[n]o se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley”. Art. 2, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 308. A su vez, el Código Civil de Puerto Rico dispone que “[n]adie podrá ser privado de su propiedad sino por autoridad competente, por causa justificada de utilidad pública o beneficio social, y mediante el pago de una justa compensación que se fijará en la forma provista *425 por ley”. Art. 282 del Código Civil de 1930 (31 L.P.R.A. sec. 1113).
Por consiguiente, toda propiedad se posee sujeto al poder del Estado de expropiarla para fines públicos. ELA v. Cia. de Ferrocarriles de P.R., 83 D.P.R. 587 (1961). Como la facultad de expropiar es un atributo inherente a la soberanía del Estado, las únicas limitaciones que pueden reconocerse a su ejercicio son que la propiedad se dedique a un uso o fin público y se le satisfaga al demandado una justa compensación por ella. M. Mercado e Hijos v. Tribl. Superior, 85 D.P.R. 370 (1962). En consecuencia, urna vez se establezca que el uso para el cual se destina la propiedad expropiada constituye un fin público, no corresponde a los tribunales revisar las determinaciones sobre la naturaleza o extensión del derecho a adquirirse, la cantidad de terreno a expropiarse, la necesidad o lo adecuado del sitio en particular, porque ésta es una función que ejerce la Legislatura, bien directamente o delegándola en agencias y funcionarios. Id.
Ahora bien, en caso de ejercer ese poder inherente, el Estado tiene la obligación de actuar conforme al procedimiento provisto por la Ley de Expropiación, que regula los procedimientos de expropiación forzosa que realiza el Estado. Ley de Expropiación Forzosa de 12 de marzo de 1903, según enmendada, 32 L.P.R.A. sees. 2901-2913. Véanse, además: Aut. Carreteras v. 8,554.741 m/c I, 172 D.P.R. 278 (2007); E.L.A. v. Soc. Civil Agrícola e Industrial, 104 D.P.R. 392 (1975). En lo pertinente, se ha establecido que en un procedimiento de expropiación, la disposición definitiva de la propiedad expropiada ocurre cuando se dicta sentencia final en el caso. Iriarte Miró v. Srio. de Hacienda, 84 D.P.R. 171 (1961). Véase, además, 32 L.P.R.A. see. 2911. La sentencia final por sí sola constituye el título del demandante a la finca expropiada, razón por la cual no es necesario ordenar al demandado que otorgue una escritura transfiriendo el terreno objeto de la expropiación al demandante. Cerra v. Fajardo Development Co., 18 D.P.R. 1024 (1912).
*426 IV
El injunction es un mandamiento judicial expedido por escrito, bajo el sello de un tribunal, que requiere a una persona que se abstenga de hacer, o de permitir que se haga por otras bajo su intervención, determinada cosa que infrinja o perjudique el derecho de otra. Ley de 8 de marzo de 1906 (32 L.P.R.A. see. 3521). Este remedio provisional o permanente se utiliza para hacer efectivo el derecho sustantivo que se está ejercitando en la demanda. Abella v. Fernández et al., 17 D.P.R. 1063 (1911). Véase, además, D. Rivé Rivera, Recursos Extraordinarios, San Juan, Programa de Educación Legal Continuada de la U.I.P.R., Facultad de Derecho, 1989.
Por otro lado, es menester señalar que el injunction es un remedio extraordinario que se caracteriza por su perentoriedad, por ser una acción dirigida a evitar un daño inminente o a reestablecer el régimen de ley conculcado por conducta opresiva, ilegal o violenta del transgresor del orden jurídico. Peña v. Federación de Esgrima de P.R., 108 D.P.R. 147 (1978); Ortega Cabrera v. Tribunal Superior, 101 D.P.R. 612 (1973). Además, por su naturaleza de recurso extraordinario, el injunction es de carácter discrecional. Pérez Vda. Muñiz v. Criado, 151 D.P.R. 355 (2000); A.P.P.R. v. Tribunal Superior, 103 D.P.R. 903 (1975); Franco v. Oppenheimer, 40 D.P.R. 153 (1929); Martínez v. P.R. Ry. Light & Power Co., 18 D.P.R. 725 (1912).
Por razón del origen del injunction en las Cortes de equidad inglesas, el principio de equidad que gobierna su concesión o denegación exige que la parte promovente demuestre la ausencia de un remedio adecuado en ley. Pérez Vda. Muñiz v. Criado, ante. Se estiman como remedios legales adecuados aquellos que pueden otorgarse en una acción por daños y perjuicios, en una criminal o cualquiera otra disponible. Id. Por consiguiente, mientras exista al *427 gún remedio eficaz, completo y adecuado en ley, no se considera el daño como irreparable, por lo que no procederá conceder el injunction. Íd.; A.P.P.R. v. Tribunal Superior, ante; Franco v. Oppenheimer, ante; Martínez v. P.R. Ry. Light & Power Co., ante.
Dicho de otro modo, con relación a este remedio en equidad, constituye un daño irreparable aquel que no puede ser adecuadamente satisfecho mediante la utilización de los remedios legales disponibles. Pérez Vda. Muñiz v. Criado, ante. En dichos casos procede el remedio de injunction. Ahora bien, la determinación de lo que constituye un remedio apropiado en ley y, por ende, daño irreparable, va a depender de los hechos y las circunstancias de cada caso en particular. A.P.P.R. v. Tribunal Superior, ante; Chardón v. Laffaye, 43 D.P.R. 650 (1932); Loíza Sugar Company, v. Hernaiz y Albandoz, 32 D.P.R. 903 (1924); Martínez v. P.R. Ry. Light & Power Co., ante.
El injunction preliminar tiene el propósito de mantener el statu quo hasta que se celebre el juicio en sus méritos, por lo cual la orden de injunction preliminar, ya sea requiriendo un acto o prohibiéndolo, evita que la conducta del demandado produzca una situación que convierta en académica la sentencia que finalmente se dicte, o que se le ocasionen daños de mayor consideración al peticionario mientras perdura el litigio. Mun. de Ponce v. Gobernador, 136 D.P.R. 776 (1994). Al evaluar la procedencia de un injunction preliminar deben evaluarse los criterios siguientes: (1) la naturaleza de los daños que puedan ocasionársele a las partes de concederlo o denegarlo; (2) la irreparabilidad del daño o existencia de un remedio adecuado en ley; (3) la probabilidad de que la parte promovente prevalezca eventualmente al resolver el litigio en su fondo; (4) la probabilidad de que la causa se torne académica de no concederlo, y (5) el posible impacto sobre el *428 interés público del remedio que solicita. Mun. de Ponce v. Gobernador, ante; P.R. Telephone Co. v. Tribunal Superior, 103 D.P.R. 200 (1975).
Sin embargo, después del juicio en sus méritos y antes de ordenar un injunction permanente, el tribunal debe tomar en consideración, nuevamente, la existencia o ausencia de algún otro remedio adecuado en ley. Universidad del Turabo v. L.A.I., 126 D.P.R. 497 (1990). Los factores que se deben tomar en consideración para emitir el recurso de injunction permanente son: (1) si el demandante ha prevalecido en un juicio en sus méritos; (2) si el demandante posee algún remedio adecuado en ley; (3) el interés público implicado, y (4) el balance de equidades. Universidad del Turabo v. L.A.I., ante; Southern Packaging v. United States, 588 F. Supp. 532 (D.S.C.1984); State Ex. Rel. Guste v. Lee, 635 F. Supp. 1107 (E.D. La. 1986).
V
La moción de desestimación al amparo de la Regla 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, es aquella que formula el demandado antes de presentar su contestación a la demanda, en la cual solicita que se desestime la demanda presentada en su contra. Colón v. Lotería, 167 D.P.R. 625 (2006). El inciso (5) de esta regla establece como fundamento para solicitar la desestimación, que la demanda no expone una reclamación que justifique la concesión de un remedio. 32 L.P.R.A. Ap. III, R. 10.2(5).
Al resolverse una moción de desestimación por este fundamento, el tribunal tomará como ciertos todos los hechos bien alegados en la demanda y que hayan sido aseverados de manera clara y concluyente, y que de su faz no den margen a dudas. Colón v. Lotería, ante; Sánchez v. Aut. de los Puertos, 153 D.P.R. 559 (2001); Pressure Vessels P.R. v. Empire Gas P.R., 137 D.P.R. 497 (1994). Además, tales alegaciones hay que interpretarlas conjuntamente, liberal *429 mente y de la manera más favorable posible para la parte demandante. Id. Véase, además, Dorante v. Wrangler of P.R., 145 D.P.R. 408 (1998).
La demanda no deberá desestimarse a menos que se demuestre que el demandante no tiene derecho a remedio alguno, bajo cualesquiera hechos que pueda probar. Reyes v. Sucn. Sánchez Soto, 98 D.P.R. 305, 309 (1970); Boulon v. Pérez, 70 D.P.R. 988 (1950). Tampoco pro-cede la desestimación si la demanda es susceptible de ser enmendada. Clemente v. Depto. de la Vivienda, 114 D.P.R. 763 (1983). En fin, debemos considerar, “si a la luz de la situación más favorable al demandante, y resolviendo toda duda a favor de éste, la demanda es suficiente para constituir una reclamación válida”. Pressure Vessels P.R. v. Empire Gas P.R., ante, pág. 505. Véase, además, Unisys v. Ramallo Brothers, 128 D.P.R. 842 (1991).
Es de notar que aquellos casos en los que esté involucrado un alto interés público no debe desestimarse ninguna acción mediante este mecanismo procesal, salvo en aquellas ocasiones en que no quepa duda que bajo ninguna situación de hecho que surja lógicamente de la demanda es posible conceder un remedio adecuado, cualquiera que éste sea. Véase González Aristud v. Hosp. Pavía, 168 D.P.R. 127 (2006).
VI
Con el anterior marco doctrinal en mente, pasemos a atender las controversias que nos atañen. En primer lugar, debemos resolver si, desde su vigencia, la Ley Núm. 142, ante, mejor conocida como la Ley de la Reserva Agrícola del Valle del Coloso, impedía a A.R.Pe. aprobar segregaciones menores de diez cuerdas o si, por el contrario, dicha ley no era lo suficientemente específica para delimitar la reserva, por lo que era necesario que la Junta de Planifica *430 ción aprobara el Reglamento de Zonificación Especial para que entrara en vigor la referida prohibición.
La Autoridad de Tierras alega que los permisos de segregación otorgados por A.R.Pe. son nulos, por ser contrarios a la ley y a la política pública de ésta. Afirma la agencia que la Exposición de Motivos de la Ley de la Reserva Agrícola del Valle del Coloso es lo suficientemente específica para definir los terrenos protegidos y que el referido reglamento lo que hizo fue ampliar la cantidad de tierras que especifica la ley. Por otro lado, la Comunidad Agrícola Bianchi aduce que al momento de A.R.Pe. autorizar la segregación del terreno no estaba vigente ni el Reglamento de Zonificación Especial ni el plano de delimitación del área de la reserva, por lo que la reserva no había sido definida. Por consiguiente, sostiene que no había prohibición alguna que evitara la segregación del terreno en controversia.
Como vimos antes, la Exposición de Motivos del cuerpo legal que nos incumbe especifica el área que comprende el valle e indica las cuerdas incluidas. Además, lo describe como aquel terreno que mantiene intacta su capacidad agrícola. Nos refiere a sus límites territoriales, a sus propietarios e, incluso, nos indica que dichos terrenos han sido catalogados como zonas inundables por el Servicio de Conservación de Recursos Naturales del Departamento de Agricultura de Estados Unidos. El propio legislador declaró como reserva agrícola los terrenos comprendidos en el denominado Valle del Coloso, dentro del cual aparece el terreno segregado en controversia.
Además, en la Ley Núm. 142 la Asamblea Legislativa reconoce la importancia de la agricultura, no solamente en el ámbito ecológico y ambiental, sino como un elemento esencial para la salud económica del pueblo. De acuerdo con ello, declaró como política pública la protección de los terrenos comprendidos dentro del Valle del Coloso y los designó reserva agrícola, por poseer ciertas características *431 idóneas para destinarse al uso exclusivo de la producción agrícola y el ecoturismo.
La Ley de la Reserva del Valle del Coloso prohibió que A.R.Pe. aprobara segregaciones de menos de diez cuerdas en el área designada en la Resolución de Zonificación Especial. El que dicha resolución no se hubiese promulgado con anterioridad al otorgamiento de los permisos en controversia, no significa que A.R.Pe. estuviese autorizada a segregar terrenos que estaban claramente designados como protegidos por la Ley; todo ello en contravención, a su vez, a la política pública vigente. Las prohibiciones del Art. 3 de la Ley de la Reserva Agrícola del Valle del Coloso, ante, aplican desde la fecha en que entró en vigor dicha la ley, esto es, desde el 4 de agosto de 2000. Lo contrario iría en total contravención con la política pública de conservación de terrenos del referido estatuto, al permitir que se desmembraran dichas tierras en unidades menores de diez cuerdas y para usos no agrícolas.
De acuerdo con lo dicho, A.R.Pe. se excedió en sus facultades al autorizar las segregaciones reseñadas en terrenos que formaban parte de la Reserva del Valle del Coloso. Por lo tanto, los permisos otorgados por A.R.Pe. son nulos por ser contrarios a la Ley Núm. 142 y a la política pública establecida por la Asamblea Legislativa. “No debemos olvidar que las leyes deben ser interpretadas y aplicadas sin desvincularlas del problema cuya solución persiguen, como parte de un todo coherente y armonioso del ordenamiento jurídico”. J.P. v. Frente Unido I, ante, pág. 474.
Siendo nulos los permisos, las escrituras de segregación y compraventa otorgadas y suscritas por la Comunidad Agrícola Bianchi, por Ruiz Santiago y por Moreno & Ruiz son, igualmente, nulas; ello por carecer de un permiso de segregación válido otorgado por A.R.Pe., según exige la ley *432 orgánica de dicha agencia y el Reglamento de Lotificación Núm. 3, ante.
Por otra parte, no existe controversia en torno al hecho de que los terrenos segregados fueron expropiados por la Autoridad de Tierras, quien demandó a la Comunidad Agrícola Bianchi, titular de éstos de acuerdo con lo aquí resuelto. Habiéndose cumplido con los procedimientos de la Ley de Expropiación Forzosa y dictada una sentencia final y firme en el caso de expropiación, los terrenos del Valle del Coloso que una vez fueron propiedad de la Comunidad Agrícola Bianchi son patrimonio del Estado Libre Asociado, en particular bajo el manto de la Autoridad de Tierras.
En vista de lo anteriormente expuesto, resulta obvio que no procedía declarar “con lugar” la moción de desestimación, pues al interpretar liberalmente la demanda se establece una reclamación que justifica la concesión de un remedio. Según los hechos bien alegados en la demanda, si éstos fueran probados, los recurridos podrían ser responsables en daños y peijuicios por sus actuaciones y la Autoridad de Tierras tendría derecho a ser indemnizada.

Se reinstala el “injunction” preliminar, en vista del alto interés público implicado, con el propósito de evitar que la conducta de Moreno & Ruiz pueda convertir en académica la sentencia que finalmente pueda dictarse; es decir, que la remoción de la corteza terrestre culmine en la erosión total del suelo, lo que impediría la siembra o cultivo en éste.

VII
Por los fundamentos que anteceden, procede dictar sentencia revocatoria de la emitida en el presente caso por el Tribunal de Apelaciones y devolver el caso al Tribunal de Primera Instancia para procedimientos ulteriores compatibles con lo aquí resuelto.

Se dictará sentencia de conformidad.

(1) En el Caso Civil Núm. KAC03-0863(504) ante el Tribunal de Primera Instancia, Sala Superior de San Juan, sobre incumplimiento de contrato, expropiación a la inversa, daños y perjuicios y cobro de dinero, se ventilan asuntos relacionados a una alegada obligación que tenía la Comunidad Agrícola Bianchi de notificarle a la Autoridad de Tierras sobre, y previo a, la segregación y venta de alguno de los terrenos arrendados, entre otros asuntos.