Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IX

| | | |
|---|---|---|
| SMART DISTRIBUTORS, LLC<br><br>Recurrida<br><br><br>V.<br><br><br>LUIS GARRATÓN, LLC;<br><br>Peticionaria<br><br>Y<br><br>HALEON US CAPITAL, LLC; HALEON US LP; COMPAÑÍAS A Y B<br><br>Recurridas | KLCE202401102 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br><br>Caso Núm.: GB2023CV00955<br><br><br>Sobre: Daños contractuales; Daños y perjuicios |

Panel integrado por su presidente, el Juez Rodríguez Casillas, Juez Marrero Guerrero y Juez Campos Pérez.

Marrero Guerrero, Juez Ponente.

## RESOLUCIÓN

En San Juan, Puerto Rico, a 13 de diciembre de 2024.

Comparece Luis Garratón, LLC (Garratón o parte peticionaria) y nos solicita revisar una *Resolución* emitida el 10 de septiembre de 2024 por el Tribunal de Primera Instancia, Sala de Bayamón (TPI).[1] Mediante el aludido dictamen, el TPI declaró No Ha Lugar la solicitud de desestimación presentada por Garratón. En su *Resolución,* el Foro recurrido determinó que, al tomar como ciertas las alegaciones bien establecidas en la *Demanda enmendada,* Smart Distributors, LLC (Smart o parte recurrida) demostró una exposición fáctica de hechos y alegaciones precisas que apoyaron su reclamo de ser un distribuidor al amparo de la *Ley de Contratos de Distribución,* Ley

---

[1] Apéndice de *Solicitud de Certiorari,* Anejo 11, págs. 111-128. Archivada y notificada el 11 de septiembre de 2024.

Núm. 75 de 24 de junio de 1964, según enmendada, 10 LPRA sec. 278 *et seq.*

Por los fundamentos que expondremos a continuación, se deniega la expedición del auto de *certiorari.*

Veamos el trasfondo fáctico y procesal atinente a este recurso.

**I.**

El caso ante nuestra consideración se originó el 21 de octubre de 2023, cuando Smart instó una *Demanda* en contra de Garratón, Haleon US Capital, LLC (Haleon) y Compañías A y B.[2] En lo pertinente, la parte recurrida alegó que en junio de 2021, Garratón lo contrató verbalmente como el distribuidor de los productos Haleon que incluía los productos Advil, Panadol, Robitussin, Sensodyne, Centrum, Emergen-C, entre otros. Smart sostuvo que su labor consistía en empacar, almacenar y visitar a sus clientes de quienes obtenía pedidos y órdenes de compra que entregaba, facturaba y realizaba las gestiones de cobro. A su vez, afirmó que invirtió en materiales promocionales y exhibidores en puntos de venta. La parte recurrida adujo que durante el primer año de operaciones, distribuyó y promocionó efectivamente las marcas y los productos a través de las tiendas de conveniencia, gasolineras, colmados y farmacias en las que generó clientes adicionales para Garratón y Haleon. Asimismo, arguyó que en un periodo de doce (12) meses alcanzó un volumen de ventas que sobrepasó los $2,000,000.00 y pagó puntualmente a Garratón por las compras que realizó.

No obstante, Smart esgrimió que en mayo de 2022, Garratón suspendió sus pedidos y se negó a despachar la mercancía ordenada, lo que menoscabó la relación contractual y las ventas de su compañía sin justa causa. Señaló que Garratón le entregó mercancía hasta el

---

[2] *Íd.*, Anejo 1, págs. 1-11; Anejo 2, págs. 12-22. El 7 de enero de 2024, Smart presentó una *Demanda enmendada*, en la que incluyó como parte demandada a Haleon US LP.

12 de junio de 2022. Del mismo modo, manifestó que en julio de 2022, Garratón condicionó la entrega de la mercancía a que Smart le proporcionara información detallada sobre todas sus operaciones en Puerto Rico, incluyendo el listado de sus clientes, las ventas por cliente, los planes estratégicos y de mercadeo y el nivel de ventas por categoría. Apuntó que el 11 de agosto de 2022, la señora Rhaisa Contreras de Garratón le expresó que Haleon no había completado su análisis, por lo que requería información confidencial adicional.

Entre sus alegaciones, la parte recurrida planteó que el 2 de diciembre de 2022, el señor Orlando Piñero, el señor Carlos Abreu y la señora Angélica Díaz, en representación de Garratón, se reunieron con el Presidente de Smart, el señor Gustavo González. Particularizó que admitieron que el cese de las ventas a Smart se debió a que Haleon lo prohibió. Smart aseveró que en igual fecha recibió un correo electrónico del señor Orlando Piñero, en el que le informó que Haleon determinó detener e impedir permanentemente la venta de los productos a Smart, razón por la cual Garratón no le despachó la mercancía. Subrayó que la terminación unilateral, sin justa causa y el menoscabo de la relación existente en virtud del contrato de distribución contravino la *Ley de Contratos de Distribución, supra.* Además, concretó que le causó un daño real e irreparable, toda vez que la venta de los productos de Garratón constituía el 70% de sus ventas. Por lo anterior, solicitó una indemnización de $3,232,500.00 por la terminación de su contrato de distribución en contravención con la *Ley de Contratos de Distribución, supra,* en consideración al volumen de ventas alcanzado desde el año 2021 al 2022, la ganancia no realizada, la pérdida por la inversión de dinero en inventario y equipos promocionales, más los daños económicos a su reputación y plusvalía. Igualmente, peticionó el pago de los honorarios de abogados y los intereses previo al juicio.

Tras varios trámites procesales, el 1 de abril de 2024, Haleon presentó una *Moción de desestimación*.[3] En esta, puntualizó que, al amparo de la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2, la *Demanda enmendada* no justificó la concesión de un remedio en su contra. Argumentó que no se demostró que existía una relación de principal-distribuidor o un contrato de distribución entre Haleon y Smart. Por ello, entendió que de las alegaciones no se estableció que Smart tuviese derecho a un remedio de su parte bajo la *Ley de Contratos de Distribución, supra*. Pues, arguyó que no se presentó alguna alegación que permitiese determinar plausiblemente que Haleon advino en conocimiento del contrato verbal entre Smart y Garratón. Asimismo, concibió que no se estableció plausiblemente la terminación sin justa causa o la interferencia torticera de Haleon con el contrato de distribución entre Garratón y Smart.

Posteriormente, el 11 de abril de 2024, Garratón presentó una *Moción de desestimación de la demanda enmendada*.[4] Mediante esta, la parte peticionaria apuntó que, a tenor con la Regla 10.2 de Procedimiento Civil, *supra*, R. 10.2, en la *Demanda enmendada* no se demostró una base fáctica y legal suficiente para justificar la concesión de un remedio. Señaló que Smart no se consideraba un distribuidor al amparo de la *Ley de Contratos de Distribución, supra*, en vista de que no demostró que asumió riesgos económicos significativos ni desarrolló un mercado ni clientes específicos para los productos Advil, Panadol, Robitussin, Sensodyne, Centrum y Emergen-C. Adujo que la expansión del mercado y la adquisición de clientes para dichos productos en Puerto Rico no se debió a las actividades empresariales de Smart, sino a los esfuerzos y las campañas publicitarias de gran envergadura que los fabricantes y terceros realizaron durante décadas. Sobre el particular, especificó

---

[3] *Íd.*, Anejo 3, págs. 23-35.
[4] *Íd.*, Anejo 4, págs. 36-60.

que solamente alguien que viviese en un vacío concluiría que Smart desarrolló un mercado y clientes para los productos en Puerto Rico. Además, alegó que la interacción de la parte recurrida con los productos no se elevó al nivel de ser un distribuidor, conforme con la *Ley de Contratos de Distribución, supra*. Ante ello, esgrimió que Smart no podía atribuirse la creación de un mercado para unos productos que existían previo a su relación comercial con Garratón.

El 22 de abril de 2024, Smart presentó una *Moción en oposición a solicitud de desestimación presentada por Luis Garratón, LLC.*[5] Entre otros, manifestó que era un distribuidor a tenor con la *Ley de Contratos de Distribución, supra*. Smart detalló que en *Roberco, Inc. y Robert Colón v. Oxford Industries, Inc.*, 122 DPR 115 (1988), el Tribunal Supremo estableció que los siguientes criterios para identificar a un distribuidor bajo la *Ley de Contratos de Distribución, supra*: (1) crear un mercado favorable y conquistar una clientela para un producto o servicio; (2) tener discreción en cuanto a pactar los términos de las ventas; (3) comprar, almacenar y luego revender el productos, y (4) llevar a cabo sus obligaciones de coordinación y desarrollo de mercado, despachos y entregas de mercancías, extender crédito y los correspondientes cobros, mantenimiento de inventario, promoción, conclusión de los contratos de venta y publicidad. En torno al primer criterio, Smart planteó que atrajo nuevos clientes en el segmento del mercado asignado y otros mayoristas, ya que en múltiples ocasiones llamó para prospectar y visitó los establecimientos en los que ofreció, vendió, comercializó y entregó la mercancía a clientes pequeños que Garratón y otros competidores desatendieron. Smart distinguió entre el mercadeo y *brand awareness* de las marcas y la venta y distribución en determinado canal. Al respecto, señaló que se le asignó el canal de distribución

---

[5] *Íd.,* Anejo 5, págs. 61-81.

*Down The Trade* (DTT), el cual desarrolló y capturó clientes en beneficio de Garratón y de los productos de Haleon. La parte recurrida resaltó que el canal DTT estaba desatendido por el costo de cada parada, por lo que se concentró en llevar una variedad de productos con buena rotación.

En cuanto al segundo, tercer y cuarto criterio, Smart esbozó que compró los productos a Garratón, los almacenó, asumió el riesgo inherente de tener un inventario, añadió ganancia a los productos, visitó a los clientes, tomó órdenes que despachó, facturó y entregó mercancía. Asimismo, alegó que asumió los riesgos crediticios inherentes a las transacciones a crédito, mantuvo una página web dedicada a los productos, e invirtió en promoción, por lo que desarrolló y creó un mercado favorable para Garratón.

En igual fecha, Smart presentó una *Oposición a moción de desestimación presentada por Haleon US LP, SUMAC 29.*[6] En esta, la parte recurrida planteó que no le asistía la razón a Haleon en cuanto a que desconocía del contrato de distribución entre Garratón y Smart. Expuso que Haleon tenía conocimiento pleno sobre el contrato en cuestión, en vista de que existieron comunicaciones escritas y verbales y dio instrucciones a Garratón para que paralizara la venta de productos a Smart. Además, reiteró que existía un contrato de distribución de Smart sobre los productos de Haleon en Puerto Rico; Haleon tenía conocimiento del contrato; Haleon dio instrucciones a Garratón de detener e impedir permanentemente la venta de los productos a Smart, y como resultado, Smart sufrió daños. Por ello, la parte recurrida manifestó que Haleon interfirió con la relación contractual de un tercero y le causó daños económicos. Smart precisó que no solicitó un remedio en daños contra Haleon por virtud de la *Ley de Contratos de Distribución, supra,* sino por interferencia

---

[6] *Íd.,* Anejo 6, págs. 82-93.

torticera con las obligaciones contractuales de terceros, al amparo del Artículo 1536 del Código Civil de Puerto Rico, 31 LPRA sec. 10801.

El 10 de mayo de 2024, Haleon presentó una *Réplica a oposición de Smart a moción de desestimación presentada por Haleon.*[7] En esta, Haleon argumentó que Smart solicitó el pago solidario de las sumas reclamadas por concepto de indemnización bajo la *Ley de Contratos de Distribución, supra,* el cual era improcedente al no existir una relación contractual de distribución entre Haleon y Smart. Por ello, indicó que el TPI debía emitir una *Sentencia parcial final* para desestimar la causa de acción bajo la *Ley de Contratos de Distribución, supra*, presentada en su contra. Por otro lado, Haleon sostuvo que no interfirió intencionalmente con el contrato de distribución alegado por Smart, ya que sus actuaciones comerciales eran legítimas y estaban justificadas contractualmente. Esto, al aducir que entre Haleon y Garratón existía un contrato en el que se exponía los clientes exclusivos a quienes Garratón podía vender los productos de Haleon, entre los cuales Smart no estaba autorizado. Según Haleon, por esta razón le requirió a Garratón cesar la venta de sus productos a Smart. Haleon enfatizó que hizo valer las disposiciones de un contrato previo, sin tener la intención de interferir con la relación entre Garratón y Smart, ni ser responsable de la terminación de dicha relación. Sobre el particular, acentuó que Garratón propuso discutir oportunidades de distribución de otros productos para mantener la relación comercial con Smart.

Sometido el asunto ante su consideración, el 10 de septiembre de 2024, el TPI emitió una *Sentencia parcial* en la que declaró Ha Lugar a la solicitud de desestimación de Haleon.[8] Ello, por entender que Haleon tuvo un propósito legítimo para intervenir con el contrato entre Garratón y Smart. Asimismo, determinó que Haleon hizo valer

---

[7] *Íd.,* Anejo 7, págs. 94-101.
[8] *Íd.,* Anejo 12, págs. 129-145. Archivada y notificada el 11 de septiembre de 2024.

una disposición contractual previa con Garratón de tener una lista exclusiva de clientes autorizados a vender sus productos. Por ello, concluyó que las actuaciones de Haleon no constituyeron una interferencia indebida con el contrato verbal entre Garratón y Smart. Tras evaluar el expediente, el Foro Primario formuló las siguientes determinaciones de hechos:

1. En junio de 2021, Smart fue contratado de manera verbal por Garratón, para distribuir los productos de Haleon en Puerto Rico, entre ellos, Advil, Panadol, Robitussin, Sensodyne, Centrum, Emergen C, y otros.

2. Smart logró distribuir y promocionar los productos y las marcas asignadas, a través de tiendas de conveniencia, gasolineras, colmados, farmacias y otros.

3. Smart alcanzó un volumen de ventas de sobre $2 millones, en 12 meses.

4. Smart invertía en material de promoción, compraba, almacenaba los materiales en sus instalaciones, visitaba a sus clientes de quienes obtenía pedidos de mercancía y órdenes de compra, luego empacaba, entregaba la mercancía, les facturaba y hacía las gestiones de cobro a sus clientes.

5. El 22 de noviembre de 2021, Smart le remitió a Garratón una proyección de ventas en cada uno de los productos y empaques, según requerido.

6. En mayo de 2022, Garratón le puso por primera vez un "hold" a los pedidos de Smart.

7. El 12 de junio de 2022, fue la última vez que Garratón le despachó la mercancía a Smart.

8. En julio de 2022, Garratón condicionó las entregas futuras de mercancía a que Smart le proveyera información detallada de todas sus operaciones en Puerto Rico.

9. Smart le insistió a Garratón para que le despacharan la mercancía ordenada que le hacía falta para entregar a sus clientes.

10. El 11 de agosto de 2022, Garratón le indicó a Smart que Haleon no había terminado su análisis, y le continuó solicitando "información confidencial" a Smart.

11. El 27 de octubre de 2022, Smart envió una carta a Garratón y Haleon, en la cual solicitó una explicación de cuál era la razón para negarse a despacharle la mercancía solicitada.

12. El 2 de diciembre de 2022, Garratón le indicó a Smart que la razón por la que no le venderían más era porque Haleon les había prohibido venderle a Smart.

13. Dicha determinación fue remitida, ese mismo día, a través de un correo electrónico, el cual le informó a Smart que Haleon por parte de Garratón hacia Smart y esa era la

razón por la que no le habían despachado más mercancía desde el verano de 2022 a Smart.

14. La misiva enviada por correo electrónico detalló que Smart nunca estuvo dentro del contrato [entre] Garratón y Haleon, por lo que Garratón solo le debía vender a clientes explícitamente nombrados en el contrato de Garratón y Haleon.

15. En la alternativa, Garratón le propuso a Smart discutir otras oportunidades del portfolio de Garratón con Smart (fuera de Haleon) y buscar desarrollar oportunidades comerciales a largo plazo con otras marcas de las que manejan.

En igual fecha, el Foro Primario emitió una *Resolución* en la que declaró No Ha Lugar a la solicitud de desestimación de Garratón.[9] El TPI resolvió que, al tomar como ciertas las alegaciones bien establecidas e interpretarlas de manera conjunta y liberalmente a favor de la parte recurrida, la *Demanda enmendada* desglosó alegaciones precisas y una exposición fáctica de hechos que apoyaron la conclusión de que era un distribuidor protegido bajo la *Ley de Contratos de Distribución, supra*. El Foro *a quo* indicó que Smart asumió riesgos económicos significativos y desarrolló un mercado o clientela para los productos. Asimismo, consignó que Smart controvirtió con argumentos sustanciales los hechos que motivaron la reclamación. A saber, (1) que Smart fue designado como distribuidor por Garratón para ciertos productos en Puerto Rico; (2) que desde el 2021 Smart logró capturar y atender un mercado específico que presuntamente Garratón no atendía adecuadamente; (3) que durante el primer año de operaciones Smart fue exitoso y efectivo, por lo que alcanzó ventas que sobrepasaron los $2,000,000 para el beneficio de Garratón, y (4) que al Garratón darse cuenta, unilateralmente, menoscabó la relación existente entre ellos, a instancias de Haleon, sin justa causa.

Inconforme con el dictamen emitido por el TPI, el 11 de octubre de 2024, Garratón presentó una *Solicitud de Certiorari* ante este

---

[9] *Íd.*, Anejo 11, págs. 111-128. Archivada y notificada el 11 de septiembre de 2024.

Tribunal de Apelaciones y planteó que el Foro Primario incidió, formulando los siguientes señalamientos de error:

> **A.** La Ley Núm. 75 concede un remedio a "distribuidores" que se identifican fundamentalmente por su gestión de crear un mercado favorable y conquistar una clientela para un producto. Surge de las alegaciones en la Demanda Enmendada y de los hechos objeto de conocimiento judicial que el mercado favorable y [la] clientela para los distribuidos [por] Garratón existían desde mucho antes que Smart comenzara a adquirirlos en junio de 2021. Erró el TPI al no desestimar con prejuicio la Demanda Enmendada toda vez que Smart no es un "distribuidor" bajo la Ley Núm. 75.

> **B.** En la alternativa, la Ley Núm. 75 dispone que un principal puede dar por terminada una relación de distribución cuando medie justa causa. En la Sentencia Parcial, el TPI desestimó con perjuicio la acción de interferencia torticera en contra [de] Haleon debido a que surge de las alegaciones y otros documentos en el récord judicial que Haleon actuó sin culpa fundamentada en el propósito legítimo de tener una lista exclusiva de clientes autorizados a quienes Garratón puede vender sus productos. Erró el TPI al no desestimar con perjuicio la acción bajo la Ley Núm. 75 en contra de Garratón debido a que actuó a base de una decisión lícita de Haleon, en cumplimiento con sus propias obligaciones contractuales previas, lo que bajo la Ley Núm. 75 debió constituir justa causa.

En esencia, Garratón alegó que el TPI erró al aplicar el estándar de plausibilidad, al no reconocer que cuando le suministró los productos Advil, Panadol, Robitussin, Emergen-C, Centrum y Sensodyne a Smart, ya existía un mercado favorable y una clientela para los referidos productos. Arguyó que la preexistencia del mercado y la clientela demuestra que cualquier acuerdo verbal entre las partes debía clasificarse como una mera compraventa o suministro de los productos, lo cual no convirtió a Smart en un distribuidor bajo la *Ley de Contratos de Distribución, supra*. Por ello, la parte peticionaria diferenció entre un contrato de suministro al amparo de la *Ley de Contratos de Distribución, supra*, y un contrato de suministro por virtud del Código Civil de Puerto Rico, *supra*, sec. 10021 *et seq.* A su vez, indicó que de las alegaciones de la *Demanda* se desprendió la ausencia de términos de créditos, plazos en el pago, y funciones u obligaciones entre Garratón y Smart para el desarrollo de un mercado o clientela. En consecuencia, la parte peticionaria concibió que su única obligación era entregar los productos de forma periódica o

continuada a cambio de un pago por parte de Smart. Según Garratón, estas obligaciones por sí solo no convirtieron a las partes en principal-distribuidor a tenor con la *Ley de Contratos de Distribución, supra.*

Por otro lado, la parte peticionaria puntualizó que las alegaciones de Smart de que creó clientes adicionales para beneficio de Garratón y Haleon, así como enfocarse en el canal DTT, carecían de fundamentación, más eran concluyentes. Adicionalmente, manifestó que las alegaciones de la parte recurrida de comprar productos de Garratón, almacenarlos en sus instalaciones, visitar a sus clientes, invertir en material y esfuerzos de promoción, obtener pedidos y órdenes que empacaba, entregaba y facturaba no lo convirtieron en distribuidor. Ello, toda vez que no creó un mercado favorable ni conquistó una clientela para los productos en las tiendas de conveniencia, gasolineras, colmados y farmacias. En cambio, sostuvo que Smart simplemente suministró los productos sin convertirse en distribuidor cubierto por la *Ley de Contratos de Distribución, supra.*

Garratón nos invitó a tomar conocimiento judicial sobre los siguientes hechos sustentados por reportes noticiosos y videos publicitarios de las marcas en las redes sociales:

1. Los productos Advil, Centrum, Emergen C son hechos en Guayama, Puerto Rico.

2. Los productos Advil, Panadol, Robitussin, Sensodyne y Centrum han sido objeto de campañas de publicidad en Puerto Rico por décadas.

3. Las campañas publicitarias de los productos Advil, Panadol, Robitussin, Sensodyne, Centrum y Emergen C, incluyen anuncios y promociones en televisión, periódicos de circulación general en Puerto Rico, páginas de internet oficiales para cada uno de los productos y diferentes plataformas en las redes sociales como Facebook y YouTube.

4. Los productos Advil, Panadol, Robitussin, Sensodyne, Centrum y Emergen C se han mercadeado de manera consistente y regular en periódicos de circulación general en Puerto Rico, incluyendo en El Nuevo Día, El Vocero, Metro, entre otros.

5. Los productos Advil, Panadol, Robitussin, Sensodyne, Centrum y Emergen C están disponibles en gasolineras,

colmados, tiendas de conveniencia y en farmacias de la comunidad alrededor de Puerto Rico antes del 2021.

6. El 18 de octubre de 2012, Noticel publicó en su página web una campaña publicitaria mediante la cual se promocionó la disponibilidad de Panadol en farmacias, supermercados y colmados. Dicha promoción de Panadol en Noticel lee: "Panadol Advance ya está disponible en el mercado en todas las farmacias principales, supermercados, tiendas de descuento y colmados a través de toda la Isla".

7. El 6 de junio de 2017, Advil lanzó la siguiente campaña publicitaria en su página oficial de Facebook, Advil Puerto Rico, a través de la siguiente promoción: "Si la alergia te ataca en el tapón, para en la gasolinera y llévate un sobre[c]ito de Advil Allergy & Congestion Relief. Una sola tableta y estarás lista para la oficina".

8. El 2 de agosto de 2018, Advil publicó en su página oficial de Facebook, Advil Puerto Rico, un anuncio que indicaba: "Consigue el alivio rápido con nuestra presentación de sobrecitos, cómodos y prácticos, disponibles en gasolineras y colmados alrededor de la Isla. Para que no te sorprenda el dolor, siempre guarda el tuyo en la wallet".

9. El 13 de noviembre de 2018, el periódico Metro publicó una campaña publicitaria promocionando la disponibilidad de los productos Advil en gasolineras, colmados y establecimientos de conveniencia a través de Puerto Rico. Dicha promoción en Metro lee: "Advil Multi-Symptom Cold & Flu, está hecho en Puerto Rico en la planta Pfizer en Guayama y ya está disponible en las principales cadenas de farmacias, comercial al detal y farmacias de la comunidad en empaques de 10 y 20 tabletas. Además, está disponible en empaques individuales en gasolineras, colmados y otros establecimientos de conveniencia, según se indicó por escrito".

10. El 22 de abril de 2020, Centrum publicó en su página oficial de Facebook, Centrum Puerto Rico, un anuncio que lee: "Obtén las vitaminas y nutrientes que te da Centrum directo en tu carro. Ahora puedes pasar por el servicarro de tu farmacia con tranquilidad y pedir la [multivitamina] Centrum para ayudar a apoyar tu sistema inmunológico".

11. Smart fue organizada como una compañía de responsabilidad limitada en el Departamento de Estado de Puerto Rico el 15 de diciembre de 2020.

Garratón alegó que, a tenor con los hechos propuestos, Smart no podía probar que gestionó la creación de un mercado favorable y conquistó una clientela para los productos Advil, Panadol, Robitussin, Emergen-C, Centrum y Sensodyne en el mercado de tiendas de conveniencia, gasolineras, colmados y farmacias. Esto, al percibir que los aludidos productos en estos puntos de venta al detal existían desde mucho antes que Smart comenzara a suministrarlos. Según la parte peticionaria, para considerarse un distribuidor bajo la

*Ley de Contratos de Distribución, supra,* era indispensable realizar gestiones e inversión en promoción, publicidad y mercadeo para la creación de un mercado favorable y conquistar una clientela. Esgrimió que el manufacturero de los productos y terceros fueron quienes invirtieron en campañas publicitarias. Garratón adujo que la parte recurrida no asumió el riesgo o la incertidumbre de dedicar recursos al desarrollo del mercado local para los productos que adquirió de Garratón, sino que asumió el rol de un mero conducto para que los productos se trasladaran del manufacturero al consumidor. Por ello, la parte peticionaria concibió que el contacto de Smart con los productos no se elevó a nivel de ser un distribuidor, sino de suministrador. Puntualizó que se debería desestimar la *Demanda enmendada* ya que, de otra manera, *Ley de Contratos de Distribución, supra,* sería extensiva a una parte que no introdujo los productos que adquirió de Garratón ni ideó, financió o formó parte de los esfuerzos de mercadeo y promoción para establecer efectivamente dicho mercado y clientela.

En su argumento alternativo, la parte peticionaria expresó que la terminación de Smart como su distribuidor se debió a que actuó basado en la decisión lícita de Haleon de vender exclusivamente a los compradores que figuren en la lista autorizada por Haleon y de cumplimiento con sus obligaciones contractuales. Así las cosas, vislumbró que al estar fuera de su control la continuación de la concesión, existió justa causa para los fines de la *Ley de Contratos de Distribución, supra.* Garratón discutió que la prohibición legal y comercialmente justificable que tomó Haleon en cuanto a vender a Smart no podía sujetarlo a responsabilidad civil.

Por su parte, Smart razonó que Garratón se equivocó al aducir que era un revendedor a quien se le suministró productos y no un distribuidor a tenor con los requisitos de la *Ley de Contratos de Distribución, supra.* Por el contrario, argumentó que el TPI no se

equivocó al establecer que la *Demanda enmendada* estableció una reclamación válida y plausible que ameritaba la concesión de un remedio. Pues, subrayó que Garratón lo contrató verbalmente como el distribuidor de los productos de Haleon para distribuir una serie de medicamentos por el canal DTT que abarcaba pequeños comercios, en donde realizó visitas constantes, así como una optimización y control de entregas eficiente para cumplir con las promesas de entrega. A su vez, planteó que, consistente con lo establecido en *J. Soler Motors v. Kaiser Jeep Int'l*, 108 DPR 134 (1978), sólo tenía a su cargo un segmento del mercado, ya que su relación de distribuidor-principal no requería cubrir todo el territorio de Puerto Rico para ser cobijado por la *Ley de Contratos de Distribución, supra.*

Smart arguyó que era un distribuidor bajo la *Ley de Contratos de Distribución, supra,* a tenor con los criterios dispuestos en *Roberco, Inc. y Robert Colón v. Oxford Industries, Inc., supra.* En primer lugar, señaló que atrajo varios nuevos clientes en el segmento del mercado asignado y otros mayoristas desatendidos por Garratón por virtud de las múltiples llamadas prospectando, sus visitas diarias para ofrecer, vender, comercializar, recoger, reemplazar, rellenar, entregar mercancía a los clientes. En segundo lugar, destacó su reclutamiento de profesionales y vendedores con experiencia en las empresas Whitehall, Wyeth, Pfizer y GSK para identificar estrategias de canal clave para lograr resultados medibles y consistentes. Además, articuló que dicho grupo conoció las áreas de oportunidad del canal para maximizarlas. Enfatizó que el canal asignado estaba falto de atención por parte de Garratón debido al costo de cada parada. En tercer lugar, Smart acentuó que compraba, almacenaba, mantenía inventarios, asumió el riesgo inherente de tener inventario, les añadía ganancia a los productos, establecía su lista de precios, entregaba la mercancía y asumió los riesgos crediticios inherentes a transacciones de crédito. Asimismo, subrayó que mantuvo una página web

dedicada a los productos, invirtió en promoción en los medios sociales, preparó y distribuyó promoción con ofertas especiales de los productos para desarrollar y crear un mercado favorable para Garratón.

Respecto al argumento de Garratón en que los productos ya existían en el mercado, Smart adujo que el mercadeo y *brand awareness* a nivel global y nacional no debía confundirse con la venta y nueva distribución en determinado canal en Puerto Rico. Ante ello, cuestionó la incapacidad de Garratón de vender en el canal asignado, a pesar de la larga presencia de los productos en el mercado.

En atención a los errores planteados por Garratón, procedemos a exponer la normativa jurídica aplicable a este recurso.

**II.**

**A. *Certiorari***

El *certiorari* es el vehículo procesal que permite que un tribunal de mayor jerarquía revise las determinaciones de un tribunal inferior. *Rivera et al., v. Arcos Dorados et al.,* 212 DPR 194, 207 (2023); *Torres González v. Zaragoza Meléndez*, 211 DPR 821, 846-847 (2023); *Caribbean Orthopedics v. Medshape et al.*, 207 DPR 994, 1004 (2021); *McNeill Healthcare LLC v. Municipio De Las Piedras*, 206 DPR 391, 404 (2021); *800 Ponce de León v. AIG*, 205 DPR 163, 174 (2020); *Medina Nazario v. McNeill Healthcare LLC*, 194 DPR 723, 728 (2016); *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-338 (2012). Mediante este recurso extraordinario se solicita la corrección de un error cometido por un foro inferior. *Torres González v. Zaragoza Meléndez, supra,* pág. 847. Contrario al recurso de apelación, el foro apelativo posee la facultad discrecional de expedir o denegar el recurso de *certiorari* toda vez que, de ordinario, se tratan de asuntos interlocutorios. *Íd.*

La Regla 52.1 de Procedimiento Civil, *supra*, R. 52.1, dispone taxativamente las instancias en las que el Tribunal de Apelaciones

posee autoridad para expedir el auto de *certiorari* sobre un asunto interlocutorio civil. *McNeill Healthcare LLC v. Municipio De Las Piedras, supra*; *Scotiabank de Puerto Rico v. ZAF Corporation, et als.*, 202 DPR 478 (2019). En lo pertinente, si el asunto interlocutorio planteado no se encuentra dentro de las instancias que el ordenamiento jurídico otorga autoridad para intervenir, no se puede atender la controversia. El referido artículo dispone que el foro apelativo intermedio solamente expedirá un recurso de *certiorari* relacionado a una resolución u orden bajo las Reglas 56 y 57 de Procedimiento Civil, *supra*, o a la denegación de una moción de carácter dispositivo. Véase Regla 52.1 de Procedimiento Civil, *supra*, R. 52.1. A su vez, a modo de excepción, este tribunal puede revisar órdenes o resoluciones interlocutorias cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. *Íd.*

El propósito de esta regla es evitar la dilación que causaría la revisión judicial de las controversias que podrían ser planteadas en un recurso de apelación. *Scotiabank de Puerto Rico v. ZAF Corporation, et als., supra*, pág. 486; *800 Ponce de León v. AIG, supra*, pág. 175; *Rivera Figueroa v. Joe's European Shop*, 183 DPR 580, 593-594 (2011). Ahora bien, "el hecho de que un asunto esté comprendido dentro de las materias susceptibles a revisión no justifica la expedición del auto sin más". *Medina Nazario v. McNeill Healthcare LLC, supra.*

Por otro lado, la Regla 40 del *Reglamento del Tribunal de Apelaciones, supra*, R. 40, establece los criterios que debemos considerar en el ejercicio de la facultad discrecional al momento de atender una petición de *certiorari*. A saber, con el objetivo de ejercer

sabiamente la facultad discrecional, el foro apelativo intermedio debe considerar:

>   (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
>   (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
>   (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
>   (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
>   (E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

### B. Desestimación

La Regla 10.2 de Procedimiento Civil, *supra*, 10.2, delinea los fundamentos por los que se permite la desestimar de una demanda como, entre otros, dejar de exponer una reclamación que justifique la concesión de un remedio. Al evaluar una moción de desestimación al amparo de la Regla 10.2 de Procedimiento Civil, *supra*, R. 10.2, el tribunal debe interpretar las alegaciones e la demanda, de la manera más liberal posible a favor de la parte demandante. *Aut. Tierras v. Moreno & Ruiz Dev. Corp.*, 174 DPR 409, 428-429 (2008). En este sentido, el tribunal debe tomar como ciertos los hechos bien alegados en la demanda, que se aseveraron de manera clara y concluyente, y que de su faz no den margen a dudas. *Íd.*, pág. 428; *Blassino Alvarado y otro v. Reyes Blassino y otro*, 2024 TSPR 93; *Costas Elena y otros v. Magic Sport y otros*, 2024 TSPR 13; *Cobra Acquisitions v. Mun. Yabucoa et al.*, 210 DPR 384 (2022); *Casillas Carrasquillo v. ELA*, 209 DPR 240, 247 (2022); *Colón Gorbea v. Sánchez Hernández et al.*, 202 DPR 760, 765 (2019); *López García v. López García*, 200 DPR 50, 69 (2018); *Pressure Vessels PR v. Empire Gas PR*, 137 DPR 497, 505 (1994). De esta forma, la desestimación se dirige a los méritos de la controversia, más no al trámite procesal del caso. *Eagle*

*Security v. Efrón Dorado et al.*, 211 DPR 70, 83 (2023); *Cruz Pérez v. Roldán Rodríguez et al.*, 206 DPR 261, 267 (2021); *Montañez v. Hosp. Metropolitano*, 157 DPR 96, 104 (2002). Debemos destacar que una demanda sólo debe tener una relación sucinta y sencilla de los hechos demostrativo de que la parte demandante tiene derecho a un remedio. Véase, Regla 6.1 de Procedimiento Civil, *supra*, R. 6.1. No obstante, las aseveraciones conclusorias no se presumen ciertas. R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6ta ed., San Juan, Lexis Nexis, 2017, pág. 307.

Posteriormente, el tribunal debe determinar si, en base a los hechos bien alegados en la demanda, existe una reclamación plausible que justifique que la parte demandante tiene derecho a un remedio, a la luz de la experiencia y el sentido común. *Íd.*; *Costas Elena y otros v. Magic Sport y otros, supra.* De no cumplir con el estándar de plausibilidad, "el tribunal debe desestimar la demanda y no permitir que una demanda insuficiente proceda bajo el pretexto de que con el descubrimiento de prueba puedan probarse las alegaciones conclusorias". *Íd.*

Por ello, la demanda no debe desestimarse, excepto que se demuestre que la parte demandante no tiene derecho a remedio alguno, bajo cualesquiera hechos que pueda probar en apoyo a su reclamación. *Costas Elena y otros v. Magic Sport y otros, supra*; *Eagle Security v. Efrón Dorado et al., supra*, pág. 84; *López García v. López García, supra*, pág. 70; *Aut. Tierras v. Moreno & Ruiz Dev. Corp., supra*, pág. 429; *Comisión v. González Freyre et al.*, 211 DPR 579, 615 (2023). Igualmente, la demanda no debe ser desestimada si es susceptible de ser enmendada. *Íd.*

### C. Contrato de distribución

El contrato de distribución es la "relación establecida entre un distribuidor y un principal o concedente, mediante la cual, e irrespectivamente de la forma en que las partes denominen,

caractericen o formalicen dicha relación, el primero se hace real y efectivamente cargo de la distribución de una mercancía, o de la prestación de un servicio mediante concesión o franquicia, en el mercado de Puerto Rico". Artículo 1 de la *Ley de Contratos de Distribución, supra,* sec. 278. La intención legislativa al promulgar la *Ley de Contratos de Distribución, supra,* subyace en atender la problemática de las empresas domésticas y extranjeras en eliminar o gradualmente menoscabar el alcance de las relaciones establecidas con sus distribuidores, concesionarios o agentes sin justa causa. En tal virtud, la aludida ley otorga un remedio a los distribuidores cuando, tras introducir productos en el mercado y lograr su reconocimiento social y ventas suficientes, son despojados, sin justa causa del negocio gestado. *Next Step Medical v. Bromedicon et al.,* 190 DPR 474, 489 (2014); *Cruz Marcano v. Sánchez Tarazona,* 172 DPR 526, 540 (2007); *Medina & Medina v. Country Pride Foods, Ltd.,* 122 DPR 172, 189 (1988). Pues, a tenor con el Artículo 2 de la *Ley de Contratos de Distribución, supra,* sec. 278a, un principal no podrá dar por terminada una relación existente en virtud de un contrato de distribución o realizar actos directos o indirectos en menoscabo de la relación establecida o negarse a renovar dicho contrato a su vencimiento normal, excepto medie justa causa según definido por el estatuto. Véase *Next Step Medical v. Biomet, Inc.,* 195 DPR 739, 747 (2016); *Systema de PR v. Interface Int'l, Inc.,* 123 DPR 379, 386 (1989). Le corresponde al principal demostrar la existencia de la justa causa para eludir su responsabilidad. *Next Step Medical v. Biomet, Inc., supra,* pág. 754.

En lo que nos concierne, el principal es quien otorga un contrato de distribución con un distribuidor. Artículo 1 de la *Ley de Contratos de Distribución, supra,* sec. 278. Por otro lado, el distribuidor es aquella "persona realmente interesada en un contrato de distribución por tener efectivamente a su cargo en Puerto Rico la

distribución, agencia, concesión o representación de determinada mercancía o servicio". *Íd.* La relación principal-distribuidor se caracteriza por la cooperación, la estabilidad y la confianza mutua. *Roberco, Inc. y Robert Colón v. Oxford Industries, Inc., supra*, pág. 131. La finalidad de dicha relación es crear, desarrollar y obtener nueva clientela. *Íd.*

No obstante, no todo intermediario comercial constituye un distribuidor, puesto que no será suficiente un mero contacto con el producto en el transporte del distribuidor al consumidor. *Next Step Medical v. Bromedicon et al., supra*, págs. 492-493; *Cruz Marcano v. Sánchez Tarazona, supra.* Así que, con el objetivo de delimitar la figura del distribuidor, el Tribunal Supremo de Puerto Rico determinó que:

> se identifica fundamentalmente por su gestión de crear un mercado favorable y conquistar una clientela para un producto o servicio mediante la promoción y conclusión de contratos de ventas. Su función comprende generalmente las actividades necesarias para la transferencia del fabricante al consumidor, o a algún punto intermedio entre ambos, de los productos o servicios que representa. La publicidad, la coordinación del mercado, las entregas de mercancía, los cobros, el mantenimiento de inventario y principalmente la promoción y conclusión de contratos de ventas son en términos generales obligaciones del distribuidor. *Roberco, Inc. y Robert Colón v. Oxford Industries, Inc., supra*, pág. 130; *Next Step Medical v. Biomet, Inc., supra*; *Oliveras, Inc. v. Universal Ins. Co.*, 141 DPR 900 (1996); *San Juan Merc. v. Canadian Transport Co.*, 108 DPR 211, 215 (1978).

En concreto, se debe tomar en consideración los siguientes criterios realizados por el distribuidor:

1. Si el distribuidor realiza una activa promoción y/o conclusión de contratos;

2. Si adquiere inventario;

3. Si ejerce control sobre los precios;

4. Si tiene discreción en cuanto a pactar los términos de las ventas;

5. Si tiene responsabilidad por la entrega y cobro de la mercancía; y autoridad para conceder crédito;

6. Si lleva a cabo gestiones, independientes o conjuntas, de publicidad;

7. Si ha asumido el riesgo y responsabilidad en la gestión que realiza;

8. Si compra el producto, y

9. Si tiene facilidades físicas y ofrece servicios relacionados con el producto a sus clientes. Véase *Roberco, Inc. y Robert Colón v. Oxford Industries, Inc., supra,* págs. 131-132; *Lorenzana v. Gen. Accid. Ins. Co.,* 154 DPR 547 (2001); *Cobos Liccia v. DeJean Packing Co., Inc.,* 124 DPR 896, 907 (1989).

Entre estos, la creación del mercado y la conquista de una clientela constituye un fundamento para indemnizar al distribuidor por la terminación arbitraria del contrato. *San Juan Merc. v. Canadian Transport Co., supra.* **Ahora bien, los criterios antes expuestos no constituyen una lista taxativa para determinar si una persona es un distribuidor**. *Next Step Medical v. Bromedicon et al., supra,* pág. 493; *Roberco, Inc. y Robert Colón v. Oxford Industries, Inc., supra,* pág. 132. **Pues, ninguno es determinante por sí, toda vez que el tribunal debe considerar dichos factores a la luz de la prueba vertida en el Tribunal de Primera Instancia**. *Íd.*; *Cobos Liccia v. DeJean Packing Co., Inc., supra.* Sin embargo, para que el tribunal esté en posición de determinar si se trata de un distribuidor al amparo de la *Ley de Contratos de Distribución, supra,* la parte promovente tiene el peso de la prueba en demostrar las obligaciones establecidas, la intención de los contratantes y el propósito del contrato. *Next Step Medical v. Bromedicon et al., supra,* pág. 495.

Es menester puntualizar que para que el distribuidor pueda ser acreedor de los remedios establecidos en la *Ley de Contratos de Distribución, supra,* no se requiere exclusividad en la distribución de un producto o en la prestación de un servicio. *Íd.,* pág. 494; *J. Soler Motors v. Kaiser Jeep Int'l, supra*; *Medina & Medina v. Country Pride Foods, Ltd., supra,* 185.

Esbozada la normativa jurídica, procedemos a aplicarla a los hechos que nos conciernen.

**III.**

En el presente caso, Garratón nos peticionó revocar la determinación del TPI en declarar No Ha Lugar su solicitud de desestimación de la causa de acción que instó Smart en su contra al amparo de la *Ley de Contratos de Distribución, supra.* Mediante la Resolución recurrida, el Foro Primario resolvió que, al tomar como ciertas las alegaciones bien establecidas e interpretarlas de manera conjunta y liberalmente a favor de la parte recurrida, la *Demanda enmendada* desglosó alegaciones precisas y una exposición fáctica de hechos que apoyaron la conclusión de Smart ser un distribuidor protegido bajo la *Ley de Contratos de Distribución, supra.* Por ello, ordenó la continuación de los procedimientos para que, a la luz de la evidencia vertida, poder determinar si el demandante es un distribuidor protegido al amparo de la *Ley de Contratos de Distribución, supra,* y los daños sufridos ante la presunta terminación del contrato de distribución sin justa causa.

La parte peticionaria sostuvo que el TPI se equivocó al no considerar que los productos Advil, Panadol, Robitussin, Sensodyne, Centrum y Emergen-C existían en el mercado previo a establecer la relación comercial con Smart. En la alternativa, arguyó que medió justa causa para la terminación del contrato de distribución pactado con la parte recurrida.

Tras un minucioso examen de la totalidad el expediente ante nuestra consideración, a tenor con los criterios de la Regla 52.1 de Procedimiento Civil, *supra,* R. 52.1, y la Regla 40 del Reglamento del Tribunal de Apelaciones, *supra,* R. 40, declinamos ejercer nuestra facultad revisora. Nótese, que bajo la Regla 10.2 de Procedimiento Civil, *supra,* el TPI tomó como ciertas las alegaciones bien establecidas y las interpretó de manera conjunta y liberalmente a favor de la parte recurrida. Así las cosas, en esta etapa inicial de los procedimientos no encontramos ninguna circunstancia que nos

permita revisar el recurso en sus méritos. En la medida que avanza el descubrimiento de prueba, el Foro Primario se encontrará en mejor posición para aquilatar la prueba que se vierta ante su consideración y determinar si Smart es un distribuidor a la luz de la *Ley de Contratos de Distribución, supra,* y la jurisprudencia interpretativa, en consideración con las circunstancias particulares de este caso. Asimismo, es el TPI quien puede valorar la evidencia que se presente respecto a los daños sufridos por Smart ante la acción de Garratón de terminar el contrato de distribución, si alguno. Conforme a los criterios establecidos en la Regla 40 de nuestro Reglamento, *supra,* no entrevemos que la expedición del auto disponga del caso en este momento, ni tenga el efecto de evitar un fracaso irremediable a la justicia. Tampoco la parte peticionaria no demostró que el TPI haya actuado contrario al derecho. El Foro recurrido ejerció prudente y razonablemente su discreción al denegar la desestimación de la causa de acción presentada por Smart.

En virtud de lo anterior, se deniega la expedición del auto de *certiorari* solicitado.

**IV.**

Por los fundamentos que anteceden, se deniega la expedición del auto de *certiorari.*

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones